## WASHINGTON CLEANERS & DYERS, INC. v. WILLIAM G. ALBRECHT ET AL.

[No. 15, April Term, 1929.]

390

*Decided May 23rd, 1929.*

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, DIGGES, and PARKE, JJ.

*David Ash* and *Charles Jackson,* for the appellant.

*Paul R. Kach,* for the appellees.

OFFUTT, J., delivered the opinion of the Court.

The appellant in this case has, since September, 1923, owned and operated a cleaning and dyeing establishment at

1917 West Vine Street, in Baltimore City. Vine is a narrow street lying between Lexington and Fayette Streets, and appellant's plant is on the south side of the street between Monroe Street on the east and Payson Street on the west. Ajoining it is a public garage, and across the street from it are a number of private garages. Between Vine and Fayette Streets there is a ten-foot alley separating the rear yards of the houses fronting on the south side of Vine Street from the rear yards of those fronting on the north side of Fayette Street. Except for the garages, several churches, a hospital, a convent, and an occasional store, the neighborhood is almost entirely residential, is solidly built up with blocks of two and three story brick houses, and is densely populated.

Appellant's business consists of cleaning and dyeing fabrics and textiles of all kinds, and, in the course of it, it uses large quantities of gasoline and varnalene, a cleaning fluid less volatile than gasoline, but more volatile than kerosene; and in the operation of its plant it operates a steam boiler, formerly heated by a coal burning but now by an oil burning furnace. The fumes, smoke, and gases from that furnace, as well as certain fumes from "drying" rooms, are conducted to the open air through a sixty-five-foot smoke stack, in which there is fixed a screen having a mesh of one eighth of an inch.

Shortly after appellant began to operate its Vine Street plant, persons residing nearby complained of the effect of its operation upon their health and convenience, and those complaints increased until they eventually culminated in the bill of complaint which the appellees filed in this case on August 18th, 1927, in Circuit Court No. 2 of Baltimore City, on their behalf as well as on behalf of all others in like situation with them. After alleging facts indicating the position which the several complainants respectively occupied in reference to the subject matter of the suit, and other facts not material to this inquiry, the bill states:

> "That in addition to the plant so maintained and operated by the defendant on West Vine Street constituting a fire hazard, the carrying on of the business therein conducted also generates and releases into the

surrounding atmosphere constantly a heavy and objectionable odor of gasoline which passes into the atmosphere, circulates about the neighborhood and seriously disturbs and interferes with your orators and the other citizens of the neighborhood in the conduct of their ordinary affairs. That persons in the neighborhood including some of your orators are thereby at times forced to suffer severe headaches and have been unable to eat their meals or to leave their windows open even though the weather be warm. That your orators inform the court that the persons immediately adjacent to said plant of the defendant find said gasoline fumes so heavy and so offensive that they virtually 'taste' the same in the meals set upon their tables. Your orators therefore say that said gasoline fumes create a menace dangerous to health and destructive to property values.

"That your orators aver that not only does the plant of the defendant constitute a fire hazard and the fumes of gasoline generated by the same menace health and property values, but your orators further say that the defendant, by the operation of the boiler found in said plant, creates and spreads into the surrounding air an immense volume of smoke and soot, all of which, being heavier than air, spreads about and covers the entire neighborhood adjacent to the said plant of the defendant. That in certain instances your orators and other housewives about the same have found the soot so scattered so dense and objectionable as to ruin their wash spread to dry in their back yards and require a second washing of the same. That it settles upon and gradually ruins the paint placed upon their houses, and enters into their houses and settles upon their furniture. That these clouds of smoke are sufficient to render it impossible for the neighbors close to said plant to sit in comfort upon their back porches while the said plant is in operation and the wind blowing in their direction or to leave their windows open.

"That your orators aver that the fumes of gasoline and the clouds of smoke hereinbefore mentioned spread

over so much of the neighborhood that they have entered and been objectionable in the very operating room of the Bon Secours Hospital located approximately a city block away.

"That your orators aver therefore that the maintaining of said plant by the defendant at the aforesaid location and the operating of the same as it is now operated by the defendant create a condition 'naturally productive of actual physical discomfort to persons of ordinary sensibilities and of ordinary tastes and habits,' and create a nuisance.

"That dwelling houses are found immediately to the rear of said plant separated from the same only by a ten-foot alley and by the length of their own yards, and dwelling houses are built immediately against the same on the west on Vine Street itself. That all these houses were erected years before the plant of the defendant was built.

"That the nuisance aforesaid is injurious and dangerous to health, is calculated to cause physical suffering and mental anguish and has reduced the value of property, to the great loss of your orators and the hundreds of other persons on whose behalf this bill is brought, and to the detriment of their health and happiness."

The appellant's answer to that bill was in effect a direct traverse of all allegations of fact designed to show that it caused or maintained a nuisance. The case was set down for testimony and a hearing upon those pleadings, and, at the conclusion of the hearing, the court passed, on April 28th, 1928, a decree which in part provided:

"Wherefore, it is further ordered, adjudged and decreed that the defendant:

"1. So arrange and reconstruct its factory at the location mentioned in the bill of complaint that no fumes of cleansing fluid deleterious to the health of the neighbors be given off.

"2. Install the finest mesh practical in the spark arrester in the stack at said plant.

"And it is further ordered, adjudged and decreed that the defendant be given three months from the date hereof to comply with the terms of this decree, and that if within said period it shall not have complied with this decree, an injunction be issued restraining the defendant from carrying on its business at said location in violation of the terms hereof."

Thereafter, on the eighth of the following November, the appellees filed a petition in which they charged that appellant had not complied with the decree of April 28th and praying the court to adjudicate "it in contempt." That petition was also in due course set down and, after testimony had been taken and the parties heard, the court passed the following decree:

"The court being of the opinion that the defendant has not complied with the decree of this court passed in these proceedings on the 25th day of April, 1928, and that it has continued to operate its business at the location mentioned in the testimony so that noxious gases that produce actual physical and mental discomforts to persons of ordinary sensibilities and habits living in the vicinity of the plant, including the individual plaintiffs, continue to be given off, it is therefore ordered, adjudged and decreed by the Circuit Court No. 2 of Baltimore City this 12th day of December, 1928, that the defendant be and hereby is permanently restrained from using varnalene and/or gasoline for cleaning articles of clothing, rugs, lace curtains and household furnishings in the carrying on of its business at the location in Baltimore City, more particularly described in the testimony and generally known as 1917 West Vine Street, in such quantity and manner as to be deleterious to the health of the neighborhood as above stated."

From that decree this appeal was taken.

From this statement of the case, it is manifest that if the appeal presents any question at all, it is whether the operation of appellant's plant results in the emission of fumes,

gases, or vapors which injuriously affect the health, comfort, and convenience of persons of normal sensibilities residing near it to such an extent as to deprive them of the reasonable enjoyment of the properties they respectively occupy. If it has any such effect, it is a nuisance which a court of equity will abate, and any such person so affected by it is entitled to that relief. *Woodyear v. Schaefer,* 57 Md. 9; *Adams v. Michael,* 38 Md. 128; *Susquehanna Fertilizer Co. v. Malone,* 73 Md. 276; *Block v. Baltimore,* 149 Md. 59; 46 *C. J.* 686, 687. Whether the obnoxious conditions do amount to an unreasonable interference with the rights of those affected by them to the reasonable enjoyment of their properties depends to some extent, but not entirely, upon the character of the locality in which they occur. 46 *C. J.* 666; *North. Cent. R. Co. v. Oldenburg,* 122 Md. 236; *Susquehanna Fertilizer Co. v. Spangler,* 86 Md. 562; *Chappell v. Funk,* 57 Md. 465. For persons residing in a manufacturing district must naturallly expect to find there more noise, more smoke, dust, and atmospheric pollution, than in a residential district, and conditions which might not constitute a nuisance in the one case might well be a nuisance in the other. *Ibid.* But there is a limit even to the rule of locality, for in *Susquehanna Fertilizer Co. v. Malone, supra,* it was held "that in the eye of the law, no place can be convenient for the carrying on of a business which is a nuisance, and which causes substantial injury to the property of another." The scope of that expression is limited by the statement, in the same opinion, "that in determining the question of nuisance in such cases the locality and all the surrounding circumstances should be taken into consideration; and that where expensive works have been erected and carried on, which are useful and needful to the public, persons must not stand on extreme rights and bring actions in respect of every trifling annoyance; otherwise business could not be carried on in such places. But still, if the result of the trade or business thus carried on is such as to interfere with the physical comfort by another of his property, or such as to occasion substantial injury to the property itself, there is wrong to the neighbor-

ing owner, for which an action will lie." Nevertheless, it negatives the proposition that one can, even in an industrial or manufacturing community, so use his property as to destroy the value of the property of another, or injuriously affect the physical health or comfort of the occupants thereof without becoming liable to them for the injury. *Ibid.*

Turning to the facts of the case, the evidence clearly shows that, while the neighborhood of appellant's plant is not exclusively residential, it is in no sense an industrial or manufacturing district, and that, while persons residing there might naturally and reasonably anticipate some annoyance from coal smoke and dust, there is nothing in its character which would justify the appellant in subjecting them to conditions which would expose them to the annoyances, discomforts, and inconveniences naturally incident to an industrial or manufacturing neighborhood. So that the case comes finally to this question of fact: Did the operation of appellant's plant result in the emission of gases, fumes, and vapors which so affected the health, comfort, or convenience of persons of normal sensibilities residing near it as to deprive them of the reasonable enjoyment of their homes? The learned court below, after a very careful analysis of the evidence, answered that question in the affirmative, and in that conclusion we fully concur.

While there was some conflict in the evidence, it was for the most part more apparent than real, for although the testimony of appellant's witnesses led to a different conclusion than that of appellee's witnesses, it was not necessarily in conflict, because they were both speaking of sensory impressions, which varied according to the physical characteristics of the several witnesses. Some fifteen or twenty persons testified or were ready to so testify for the appellees, that the fumes, vapors, and gases discharged from the appellant's plant were so penetrating and noxious that they caused headaches, prevented the witnesses from eating in comfort in their own homes, nauseated them, and in some instances prevented them from sleeping. Other witnesses, testifying for the appellant and having much the same opportunities of

observation, testified that they had never been affected by the operation of appellant's plant, and had not noticed the odors and gases of which the others complained.

There is in the record no definite description of the process by which appellant cleans the fabrics which it receives for treatment, but it does appear that, whatever the process may be, it involves the use of substantial quantities of some cleaning fluid, and that that fluid is a petroleum distillate. It also appears that the odors and gases emitted are similar to those resulting from the evaporation of gasoline. There was some dispute as to whether the specific fluid was in fact gasoline or varnalene, which is less volatile than gasoline, and for that reason widely used by cleaners and dyers. But that conflict is of little relative importance, because the complainants were not so much interested in the name of the substance which sickened them and interfered with their comfort and convenience, as they were in its nature and effects. And the weight of the evidence does show that, whatever the fluid used by the appellant in its cleaning process may have been, the fumes resulting from it did have a harmful and disagreeable effect upon certain witnesses who had been exposed to them. And in view of the number of such persons, it may be reasonably inferred that such fumes do affect persons of ordinary sensibilities in that manner. The purpose of the suit was not to restrain the appellant from using gasoline or varnalene as such in the operation of its business, but to restrain it from using any fluid or substance in such a manner as to deprive appellees of the reasonable enjoyment of their homes and properties. In the first decree passed in the case the court found as a fact that the process used by the appellant did result in the emission of "noxious gases that produce actual physical and mental discomfort to persons of ordinary sensibilities, tastes and habits living in the vicinity of the plant, including the individual plaintiffs." It directed it to so arrange its factory or plant as to prevent the emission of such gases, and it allowed it three months within which to make such changes as were necessary to comply with that mandate. After more than seven months

had elapsed, the complainants in the original bill, in an appropriate petition, suggested to the court that the appellant had not complied with its decree, and asked the court to declare it "in contempt" for its failure to do so. The testimony in the first case was largely subjective in character, but in connection with the petition the appellees offered the testimony of several physicians, who in substance said that gases and odors such as those emitted from the appellant's plant would injuriously affect persons of ordinary sensibilities. The only testimony offered by the appellant to the contrary was that of Dr. Penniman, a chemist, and Dr. Standish McCleary, a physician.

Dr. Penniman said that he had personally visited the plant and had detected no odors that would be deleterious to persons in the neighborhood, although in approaching the plant he had noticed a "characteristic odor," and he further said that the description given by the appellees' witnesses of the effect of such fumes upon them was not consistent with what was known of the effect of gasoline or varnalene vapors upon persons exposed to them. But on his cross-examination he said: "Doctor, you said in effect that you were familiar with persons who have been exposed to dangerous quantities of gasoline? A. Oh, yes. Q. And that they had different effects from those testified to by the witnesses here? A. Yes, it is common enough in oil works. I have spent a good many years of my life in oil works and I have seen men overcome from the fumes of gasoline and from petroleum, I suppose twenty-five or thirty times in my life. It is an intoxication and passes away within a very few minutes without any effects upon the person whatever, as far as has been able to be ascertained. Q. It passes away after the person affected is removed? A. Of course, if you put them in an atmosphere where they cannot get the proper amount of air they will die the same as they would die in the bottom of a well. Q. Doctor, have you had described to you at any time the symptoms of persons who were exposed to a lesser quantity of gasoline? A. Yes, sir. Q. What symptoms did they complain of? A. Why, I have been exposed

to it myself, over and over again, and it is a mild exhilaration which passes away in a few minutes. It is not troublesome. Q. I am talking about those who are exposed to a lesser amount? A. You mean the mere smell of it? A. Yes, sir? A. Oh, it has no effect at all. Q. You have never had any one to tell you it nauseated them? A. Absolutely no. I have been in oil works and exposed to it for months at a time."

Dr. Penniman, although a graduate physician, has never actively practiced that profession, and his conclusions appear to have been based rather upon his personal observation of the effect of gasoline vapors upon persons who were accustomed to be more or less continuously exposed to them, and who may to some extent have been inured to them, rather than upon any scientific study of its physiological effects. It is not therefore necessarily in conflict with the testimony of others, who were speaking of the effect of the vapors emitted from appellant's plant upon persons not accustomed to them.

Dr. McCleary, who had also visited the plant, and had noticed a slight odor, which he took to be that of varnalene, testified that the symptoms of which appellees' witnesses complained were not "attributable to any fumes" from appellant's plant. But his testimony was to some extent weakened by his statement that he had never treated any one for conditions resulting from exposure to varnalene vapors, nor had he ever seen any "condition that was brought about by the fumes of varnalene."

In addition to this opinion evidence, the appellees were permitted to offer the testimony of two fact witnesses, who said that appellant had done nothing to comply with that part of the original decree which required it to discontinue the operation of its plant in such a manner as to emit fumes "deleterious to the health of the neighbors," but that the conditions in respect to the omission of such fumes remained unchanged. The only testimony offered by the appellant in reply to that evidence was that of Morris Grosfield, its president, which was vague, unsatisfactory, and insufficient

to overcome the affirmative testimony offered by the petitioners.

Upon that evidence the court found as a fact that appellant had not complied with its decree of April 25th, 1928, and that it had continued to so operate its plant as to cause it to emit noxious gases, and it restrained the appellant from "using varnalene and/or gasoline for cleaning * * * in such quantity and manner as to be deleterious to the health of the neighborhood."

Considering all the evidence in the case, it is not apparent how it could have done any less. The decree does not restrain the appellant from operating its plant, or even from using varnalene or gasoline in its cleaning processes, but it properly does restrain it from operating its plant or using those fluids in such a manner as to deleteriously affect the health of persons residing in the neighborhood of it. For the notion that appellant had any vested right to bring an industrial business into a residential neighborhood, and so conduct it as to deprive persons residing there of the comfortable and convenient enjoyment of their homes, cannot be tolerated for a moment.

Appellant complains that the decree is too vague and indefinite in that it does not point out to it how it is to rearrange its plant so as to comply with its terms. But it is no part of the function of a court of equity to tell the appellant how to run its business. Such a court has the undoubted power to prevent it from so using its property as to deprive others of the reasonable enjoyment of their properties, or in appropriate cases it may grant affirmative relief by requiring a wrongdoer to remedy the mischief he has caused, but beyond that it cannot go. To require it, in such a case as this, to conduct an inquiry involving the employment of highly skilled and technically trained advisors and to formulate plans which would enable appellant to conduct its plant so as to conform to its decree verges upon absurdity. When therefore the court restrained appellant from using varnalene or gasoline "in such quantity and manner" as to "be deleterious to the

health of the neighborhood" it did precisely what it was authorized to do, no more and no less.

From what has been said it follows that in our opinion there was no error in either of the decrees involved in the appeal, and it becomes unnecessary to discuss at length the motion to dismiss so much of the appeal as invokes a review of the decree of April 25th, 1928, further than to say that that decree was obviously interlocutory and tentative, and may properly be reviewed upon this appeal (Code, art. 5, sec. 32), and the motion to dismiss will be overruled. The decree appealed from will accordingly be affirmed.

*Motion to dismiss overruled and decree affirmed, with costs.*