BALTIMORE GAS AND ELECTRIC COMPANY *v.*
DEPARTMENT OF HEALTH AND MENTAL
HYGIENE OF THE STATE OF
MARYLAND

[No. 68, September Term, 1978.]

*Decided January 3, 1979.*

*James A. Biddison, Jr.,* with whom were *W. Robert Buchanan* and *Paul W. Davis* on the brief, for appellant.

*Jeffrey E. Howard, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

We shall here hold that Maryland Code (1957, 1971 Repl. Vol., 1978 Cum. Supp.) Art. 43, § 706 (the statute) does *not* require an electric company to obtain a permit from the Department of Health and Mental Hygiene (the Department) as a condition to use of one of its "generating stations."

The statute provides in pertinent part:

> "The Department may require by regulation that before any person either builds, erects, alters, replaces, operates, sells, rents, or uses any article, machine, equipment or other contrivance specified by such regulation the use of which may cause emissions into the air, such person shall obtain a permit to do so or be required to register with the Department. The aforesaid provisions of this section shall not apply . . . to generating stations constructed by electric companies. The Secretary of Health and Mental Hygiene upon notification from the Public Service Commission of an application for a certificate of public convenience and necessity shall

prepare a recommendation in connection with the registration or permit required by this section. Such recommendation shall be presented at the hearing required under Article 78, § 54A, of the Annotated Code of Maryland. The decision of the Public Service Commission in connection with the registration or permit shall be binding on the Secretary of Health and Mental Hygiene, subject to judicial review as set forth in the provisions of Article 78, § 91, subsection (a)."

When this section was originally enacted by Chapter 244 of the Acts of 1970 it consisted only of the first sentence and exclusions (not here pertinent) in that portion of the second sentence prior to the statement relative to "generating stations constructed by electric companies." Chapter 31 of the Acts of 1971 (the Act) added the word "aforesaid" before "provisions" in the second sentence and the remainder of the present section including the language relative to "generating stations."

The Department initially read the Act as giving it no authority to require electric companies to obtain permits from it for their generating stations. After the General Assembly declined on several occasions to accede to the requests of the Department for the grant of such authority, the Department determined that a more careful study of the whole Act warranted a conclusion that electric companies could not operate their generating stations without permits from it.[1] Accordingly, it dispatched a letter to appellant, Baltimore Gas and Electric Company (BG&E), requesting that it submit applications for permits to operate "all [of its] fuel burning equipment . . . ." BG&E replied with an assertion that after careful study of the matter it was of the view that "the clear and unambiguous exception granted for electric generating stations in the second sentence of Article 43, Section 706" was "at odds" with the position taken by the Department.

---

[1] This is the second time in recent weeks we have had before us a case in which one of the agencies of the State of Maryland initially thought it did not have authority which it later contended that it did have. *See* Holy Cross. Hospital v. Health Services Cost Review Commission, 283 Md. 677, 393 A. 2d 181 (1978).

Therefore, it immediately sought a declaratory judgment in the Superior Court of Baltimore City. That court held "that the exclusionary provision of Section 706 is ambiguous." It then determined that under the Act the Department continued to have "permit authority over the then existing electric plants," but not over new facilities. It was of the view, however, that "any changes or modifications of facilities are subject to Department approval." BG&E appealed to the Court of Special Appeals. We granted the writ of certiorari prior to consideration of the case by that court.

In *Police Comm'r v. Dowling,* 281 Md. 412, 379 A. 2d 1007 (1977), we said in pertinent part relative to statutory construction, citing a number of cases for each of the statements there made:

> "The cardinal rule of statutory construction is to ascertain and carry out the real legislative intent. In determining that intent the Court considers the language of an enactment in its natural and ordinary signification. ... A corollary to this rule is that if there is no ambiguity or obscurity in the language of a statute, there is usually no need to look elsewhere to ascertain the intent of the General Assembly. ... A court may not insert or omit words to make a statute express an intention not evidenced in its original form. ... The General Assembly is presumed to have had, and acted with respect to, full knowledge and information as to prior and existing law and legislation on the subject of the statute and the policy of the prior law. ... Absent a clear indication to the contrary, a statute, if reasonably possible, is to be read so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless, or nugatory . . . ." *Id.* at 418-19.

In *Height v. State,* 225 Md. 251, 170 A. 2d 212 (1961), Judge Prescott said for the Court:

> "[W]hen the words of a statute are of doubtful meaning, the Court, in determining legislative

§ 21:8-:10, at 762-71 (6th ed. S. Gard 1972); 8 J. Wigmore, *supra*, § 2292, at 554. The privilege is based upon the public policy that " 'an individual in a free society should be encouraged to consult with his attorney whose function is to counsel and advise him and he should be free from apprehension of compelled disclosures by his legal advisor.' " *Harrison v. State, supra*, 276 Md. at 135, 345 A. 2d at 838 (quoting *Morris v. State*, 4 Md. App. 252, 254, 242 A. 2d 559, 560 (1968)); *accord*, 8 J. Wigmore, *supra*, § 2291, at 545. While never given an explicit constitutional underpinning, the privilege is, nevertheless, closely tied to the federal, as well as this State's, constitutional guarantees of effective assistance of counsel and could, if limited too severely, make these basic guarantees virtually meaningless. *Harrison v. State, supra*, 276 Md. at 133-34, 345 A. 2d at 837; *United States v. Alvarez*, 519 F. 2d 1036, 1045-47 (3d Cir. 1975); *see* U.S. Const. amend. VI; Md. Decl. of Rts., Art. 21.

Initially we observe that, given the complexities of modern existence, few if any lawyers could, as a practical matter, represent the interest of their clients without a variety of nonlegal assistance. Recognizing this limitation, it is now almost universally accepted in this country that the scope of the attorney-client privilege, at least in criminal causes, embraces those agents whose services are required by the attorney in order that he may properly prepare his client's case. Consequently, in line with the views of the vast majority of the courts in our sister jurisdictions, we have no hesitancy in concluding that in criminal causes communications made by a defendant to an expert in order to equip that expert with the necessary information to provide the defendant's attorney with the tools to aid him in giving his client proper legal advice are within the scope of the attorney-client privilege. *E.g.*, *United States v. Alvarez, supra*, 519 F. 2d at 1046 (psychiatrist); *United States v. Kovel*, 296 F. 2d 918, 922 (2d Cir. 1961) (accountant); *People v. Lines*, 13 Cal. 3d 500, 531 P. 2d 793, 800-03, 119 Cal. Rptr. 225, 232-35 (1975) (psychiatrist); *accord*, 3 B. Jones, *supra*, § 21:15, at 786-87. *But cf. State v. Mingo*, 143 N.J. Super. 411, 363 A. 2d 369, 370-71 (1976) (per curiam) (because defendant's handwriting exemplars not privileged communications,

State's solicitation at trial of opinion of defense-hired graphologist as to identity of handwriting on note sent to assault victim not barred by attorney-client privilege). This is uniquely so in cases concerning the question of a criminal defendant's sanity, because the need of an attorney to consult with a qualified medical expert is paramount. Such a medical expert not only provides testimony that usually is necessary at trial to support an insanity defense, but also "attunes the lay attorney to unfamiliar but central medical concepts and enables him, as an initial matter, to assess the soundness and advisability of offering the defense . . . and perhaps most importantly, . . . permits a lawyer inexpert in the science of psychiatry to probe intelligently the foundations of adverse testimony." *United States v. Taylor,* 437 F. 2d 371, 377 n. 9 (4th Cir. 1971).

The State here does not dispute the inclusion of psychiatric communications within the scope of the attorney-client privilege; instead, it contends that when Mrs. Pratt interposed a defense of insanity, she waived the privilege with respect to all statements she may have made to any medical expert, whether in her employ or in that of the State.[3] While there is little doubt that a client may waive this right to confidentiality, which may be done either expressly or impliedly, *see, e.g., Harrison v. State, supra,* 276 Md. at 136-38, 345 A. 2d at 839; 8 J. Wigmore, *supra,* § 2327, at 634-39; *but see* 2 H. Underhill, *Criminal Evidence* § 333, at 841 (5th ed. P. Herrick 1956) (doubtful if any waiver of the privilege should be implied in criminal cause), we have been made aware of only one decision in which a court, the New York Court of Appeals, has held that raising the defense of insanity, without more, is a relinquishment of the attorney-client privilege as to communications between the client and his alienist. In its opinion the court justified its

---

**3.** In effect, the State asks us, by judicial decision, to create a waiver of the attorney-client privilege as the General Assembly has done by providing that, in the case of the psychiatrist/psychologist-patient privilege, if the patient "introduces his mental condition as an element of his claim or defense . . . ," the privilege is waived. *See* Md. Code (1974, 1978 Cum. Supp.), § 9-109 (d) (3) (i) of the Courts Article.

Art. 75, § 40 came into our statutory law through § 2 of the same Act. Judge Irving said for the Court:

"The two sections of this Act of 1785 having been both re-enacted in 1860, when the Code was adopted, neither can have superiority over the other, and they must be construed together and both made to stand, as they did in the Act of 1785, the second sec. as an exception to the first. For convenience sake they have been separated in the Code and no longer stand in juxtaposition as in the original, but having been re-enacted at one and the same time, they must be construed as if they had continued side by side." *Id.* at 7.

We turn, therefore, to an examination of the Act. Its title states that it is an act to add new sections 763 through 768 to Art. 66C of the Code "Title 'Natural Resources,' subtitle 'In General,' subheading 'Department of Natural Resources,' to follow immediately after Section 762 thereof, and to be under the new subtitle 'Power Plant Siting' "; to add a new § 5A to Art. 66C under the subtitle previously mentioned and the subheading "Department of Natural Resources"; to repeal and reenact with amendments § 706 of Art. 43 of the Code entitled "Health," subtitle "Air Quality Control"; to repeal and reenact with amendments § 726 of Art. 66C under the subtitle "Wetlands," subheading "Private Wetlands"; to repeal and reenact with amendments § 11 of Art. 96A of the Code with the title "Water Resources," subtitle "Appropriation of Waters; Reservoirs and Dams"; to repeal and reenact with amendments § 54A of Art. 78 of the Code with the title "Public Service Commission Law," subtitle "Public Service Companies," subheading "Gas and Electric Companies"; to add a new § 54B to Art. 78; to repeal and reenact with amendments § 90 of Art. 78; to establish an environmental trust fund from a surcharge on generated kilowatt hours of electric energy to be used to underwrite a power plant environmental research and site evaluation program and to insure long-range and timely planning for power plant site selection and acquisition to strengthen the

State of Maryland's capability to define and manage a power plant environmental research program, to provide for the exercise of eminent domain and potential power plant site ownership by the Secretary of Natural Resources, to exempt from local zoning certain sites, to assign responsibility to the Secretary of Natural Resources on applications to the Public Service Commission for certificates of public convenience and necessity associated with power plant construction, to *provide for coordinated hearings and issuance of permits on applications for certificates of public convenience and necessity associated with power plant construction,* to provide for certain exceptions in the construction of certain overhead transmission lines, to define the term "construction," "to entitle the Secretary of Natural Resources to judicial review," and "generally relating to power plant siting." We shall proceed to a consideration of those various sections seriatim.

The first group of sections (now found in Code (1974, 1978 Cum. Supp.) §§ 3-301 to -305, Natural Resources Article) provides for an environmental surcharge "as an added cost of generation ... of electric energy ... in Maryland"; the payment of the funds so obtained "into the special fund known as the Environmental Trust Fund"; the administration and handling of the fund; a power plant environmental research program; long-range power plant site evaluation; acquisition by the State of sites for the construction of electric generating stations with payment to be made from the Environmental Trust Fund and ultimate acquisition of such sites by electric companies; and that the Board of Review of the Department of Natural Resources should not have jurisdiction over any proceedings arising under that subtitle but that review in the nature of judicial review should be available "as set forth in [Code (1957, 1969 Repl. Vol., 1971 Cum. Supp.)] Article 78, Sections 89 through 98" pertaining to the Public Service Commission.

The new § 5A of Art. 66C (now embodied in Code (1974) § 3-306, Natural Resources Article) specified that notwithstanding certain other provisions of law and in lieu of yet other sections, upon application to the Public Service Commission for a certificate of public convenience and

necessity associated with power plant construction where private wetlands or diversion of the waters of the State might be involved, the Public Service Commission was to notify the Department of such fact and supply it "with all pertinent available information regarding such application." The Department then was to treat the application as one similar to a request for appropriation or use of waters under Art. 96A and similar to an application for a license for dredging and filling under Art. 66C. The section set forth the procedures concerning such application including provision for the recommendation of the Department· to the Public Service Commission.

Next came the section here in controversy which we have quoted. Then in the order of things came an amendment to Art. 66C, § 726. As it previously existed, that section had referred to the necessity for a permit for anyone desiring to do certain work upon any wetlands. The amendment provided that when an electric company applied to the Public Service Commission for a certificate of public convenience "associated with power plant construction which involves private wetlands, the hearing and permit procedures sh[ould] be in accordance with Section 5A of [Art. 66C]."

An amendment to what was then Code (1957, 1964 Repl. Vol., 1970 Cum. Supp.) Art. 96A, § 11 followed next (now codified as Code (1974, 1978 Cum. Supp.) § 8-802, Natural Resources Article). That statute as it had previously existed stated that after January 1, 1934, it should be unlawful "to appropriate or use, or to begin construction of any plant, building or structure which m[ight] appropriate or use any waters of the State, surface or underground, without the consent or permit of the Department, in writing, previously obtained, upon written application therefor to the Department." The amendment said that notwithstanding other provisions of the subtitle of which § 11 was a part "an application to the Public Service Commission for a certificate of public convenience and necessity associated with power plant construction involving use or diversion of waters of the State, pursuant to Article 78, sh[ould] constitute an application for the permit required by [§ 11] and sh[ould] be handled in accordance with Section 5A of Article 66C."

The next succeeding section amended what was then Code (1957, 1965 Repl. Vol., 1970 Cum. Supp.) Art. 78, § 54A. This law provided that no electric company might begin construction or exercise the right of eminent domain relative to generating stations or overhead transmission lines carrying a voltage in excess of 69,000 volts "without having first obtained from the [Public Service] Commission a certificate of public convenience and necessity for the construction of the station or line." It then went on concerning the obtention of such a certificate. The amendments were twofold. The section as it existed prior to the enactment of the Act provided that there could be no overhead transmission line "in line with, and within one mile of, either end of any public airport runway." The amendment added, "unless the Federal Aviation Administration has determined that the construction of such overhead transmission line will not constitute a hazard to air navigation and such determination has been concurred in by the State Aviation Commission." The second amendment concerned definition of the term "construction" as used in §§ 54A and 54B, the term being defined as including "any clearing of land, excavation, or other action that would affect the natural environment of the site or route of bulk power supply facilities, but does not include changes needed for temporary use of sites or routes for non-utility purposes, or uses in securing geological data, including necessary borings to ascertain foundation conditions."

Section 54A was followed by § 54B, which was entirely new. It is now codified as Code (1957, 1975 Repl. Vol., 1978 Cum. Supp.) Art. 78, § 54B (although the 1978 Cum. Supp. comments that the 1976 amendments "so changed subsection (a) that a detailed comparison is not . . . practical"). It provided the procedure for obtention of a certificate under § 54A, specifying the filing of an application two years prior to commencement of construction or exercising the right of eminent domain; that "such application sh[ould] contain such information as the [Public Service] Commission [might] request"; that upon receipt of such application and information the Commission was to "notify all interested

persons including, but not limited to . . . the Department of Natural Resources, Department of Health and Mental Hygiene, Department of Transportation, Department of Economic and Community Development and Department of State Planning" of Maryland; and that "after publication as the Commission [might deem] proper, [it] at the public hearing required by Section 54A" was to "insure presentation of the information and recommendations from said agencies, [was to] permit the official representative of said agencies to sit during hearing of all parties," and then to allow the agencies "based on evidence relating to their areas of concern" within 15 days after the conclusion of the hearing "to modify, affirm, or amend their initial recommendations," after which, within 90 days after the hearing, the Public Service Commission was to grant or deny the permit, "or grant it subject to such conditions as it m[ight] find appropriate . . . ." The section further specified, "The granting of such certificate shall also constitute authority to dredge and/or construct bulkheads in the waters or private wetlands of the State, as well as to appropriate or use such waters; in addition, *such certificate shall also constitute registration and a permit, as required under Article 43, Section 706,* of the Annotated Code of Maryland, for the air emissions, if any, resulting from the operation of the plant." (Emphasis added.) Subsection (b) of Art. 54B then went on to provide that in cooperation with the Secretary of Natural Resources "as set forth in Section 765 of Article 66C, the Commission [was to] be responsible for assembling and evaluating annually the long-range plans of Maryland's public electric utilities regarding generating needs and means for meeting those needs," with the further proviso that the Chairman of the Public Service Commission on an annual basis was to forward to the Secretary of Natural Resources a ten-year plan "listing possible and proposed sites, including associated transmission routes, for the construction of electric power plants within the State of Maryland." Specific provision was made that sites "identified as unsuitable by the Secretary of Natural Resources in accordance with the requirements of Section 765 of Article 66C [were to] be

deleted from the plan, provided, however, nothing in [the] subsection [was to] prevent the inclusion of such site in subsequent ten-year . . . plans," the first such plan to "be submitted on or about January 1, 1972." Subsection (c) went on to require the Public Service Commission to "take cognizance of the mandate by the General Assembly to impose the surcharge per kilowatt hour of electric energy generated within Maryland" by authorizing electric companies "to add the full amount of the surcharge to customers' bills," the revenues derived from such surcharges to "be placed into the special fund known as the Environmental Trust Fund." Further provision was made relative to preparation of a budget "to carry out the provisions of th[at] Act."

The next succeeding section was an amendment to what was then Code (1957) Art. 78, § 90 relative to judicial review of any "final decision or order of the [Public Service] Commission . . . ." The amendment provided that for purposes of the subtitle "the Secretary of Natural Resources [was to] have standing to seek judicial review of the Commission's final decision or order made pursuant to Article 78, Section 54A and Section 54B relative to the environmental aspects of power plant siting."

The final two sections of the Act concerned severability and its effective date of July 1, 1971.

It will be seen that the Act contains a comprehensive plan for the erection of new power plants. In the long-term siting portion of it provision has been made for careful study which includes environmental impact at any proposed site. In instances where a new generating plant is to be erected prior law would require a permit from the Department under the section here under consideration as to air quality, from the Department of Natural Resources as to dredging or filling of private wetlands, and from the Department of Geology, Mines and Water Resources for the appropriation of ground water. This Act provided for consolidated hearings by the Public Service Commission relative to all three of these required permits, with that commission to make the ultimate determination whether such permit should be issued after all

other agencies had had due opportunity to express their views. It is to be noted, however, that if at a power plant site existing at the time of passage of the Act or at one constructed under the provisions of the Act an electric company were to decide that it needed to drive a new well — to appropriate more ground water in the terms of the statute on that subject — for sanitary purposes or any other reasons, the Act does not eliminate the pre-existing permit requirements. Likewise, if an electric company at a then existing power plant site or at one constructed under the provisions of the Act were to determine that it needed to take action involving "dredging, filling, removing or otherwise altering or polluting private wetlands" as, for instance, in the construction of a new landing area for coal or oil, the prior permit requirements continue in effect unaffected by the Act. Only in the section here under consideration has language been used which has caused a question to be raised relative to the continuation of the prior permit requirements.

With that background we proceed to further analysis of § 706. The first sentence after the disputed language specifies that the head of the Department (its Secretary) when notified by the Public Service Commission "of an application for a Certificate of Public Convenience and Necessity shall prepare a recommendation in connection with the registration or permit required by this section." What "registration or permit required by this section"? If the section is in no way applicable to "generating stations constructed by electric companies," then there is no "registration or permit required by this section." The "recommendation [is to] be presented at the hearing required under Article 78, Section 54A . . . ." The hearing under that section is by the Public Service Commission relative to desired "construction of a generating station or an overhead transmission line designed to carry a voltage in excess of 69,000 volts . . . ." Then § 706 requires that the decision of the Public Service Commission "in connection with the registration or permit [is to] be binding on the Secretary of Health and Mental Hygiene," subject to the provisions as to judicial review. The words "registration or permit" must refer back to the earlier sentence calling for

the head of the Department upon notification of an application for a certificate of public convenience and necessity to "prepare a recommendation in connection with the registration or permit required by [§ 706]." Why would the decision of the Public Service Commission "in connection with the registration or permit ... be binding on the [head of the Department]" if there is no registration or permit to be issued by him to electric companies concerning their generating stations?

We find that the statute in question is ambiguous. Thus, we are obliged to construe it.

It was suggested by the Department at oral argument that if it were not permitted to supervise the use and any changes that might be made from time to time in generating stations such stations would be without supervision and the public unprotected. This argument fails for two reasons. First of all, electric companies are subject to the overall supervision of the Public Service Commission. See, *e.g.,* Code (1957, 1975 Repl. Vol., 1978 Cum. Supp.) Art. 78, §§ 56, 59A, 61, 68, and 69. Secondly, there are yet other controls over such generating stations, some of which are vested in the Department. It concedes, as indeed it must, the existence of the statute relative to air quality control, Code (1957, 1971 Repl. Vol., 1978 Cum. Supp.) Art. 43, §§ 690-706 under which "standards for emissions into the air and the ambient air quality for each" of various areas of the State may be set by the Department. In enforcing those regulations the Department is permitted to seek injunctive relief as well as "civil penalties." Moreover, since the enactment of Chapter 12 of the Acts of 1886, the Department has had the power under what is now Code (1957) Art. 43, §§ 105-108 to proceed relative to any establishment certified to it "by any two legally qualified medical practitioners, or any three or more persons affected thereby, to be in a state of nuisance injuriously affecting any adjacent property or district, dangerous to health ... if it shall be found that the nuisance complained of is such as to injuriously affect ... or is calculated to endanger the health or life of any person ...." For generations, without regard to statute, our equity courts have been open to actions to enjoin public

nuisances. See, *e.g., Washington Cleaners v. Albrecht,* 157 Md. 389, 146 A. 233 (1929), where, long before the current hue and cry relative to air pollution, neighbors of a cleaning and dyeing establishment complained "of the effect of its operation upon their health and convenience" by virtue of the fumes emanating from it. Our predecessors upheld an injunction restraining the owner from "using varnalene and/or gasoline . . . in such quantity and manner as to be deleterious to the health of the neighborhood." As a matter of fact, half a century before that opinion Judge Alvey said for the Court in *Dittman v. Repp,* 50 Md. 516 (1879):

> "In *Adams v. Michael,* 38 Md. 123 [(1873)], this court held that a court of equity will interfere and restrain by injunction an existing or threatened nuisance to a party's dwelling, if the injury be shown to be of such a character as to diminish materially the value of the property as a dwelling, and seriously interfere with the ordinary comfort and enjoyment of it, and that the injury be such as to entitle the party complaining to substantial damages in an action at law. That was the case of a manufacturing establishment about to be erected in immediate proximity to the dwellings of the parties complaining, and where, according to the allegations of the bill, large volumes of smoke, offensive odors and noxious vapors, would be emitted from the factory, during its operation, whereby the value of the dwellings would be materially lessened, and the comfort of their occupiers greatly interfered with, and their health impaired. The injunction was refused in that case, but solely because of the defective allegations of the bill. Here the allegations of the bill are sufficient, and the principles laid down in *Adams v. Michael* fully apply." *Id.* at 521.

See also the annotation on this subject appearing at page 123 of the Perkins edition published in 1899 of *Adams v. Michael,* 38 Md. 123 (1873).

Although there is no "long standing" administrative

interpretation by the Department of the statute in question as the term "long standing" has heretofore been interpreted by this Court, we nevertheless regard it as significant that the Department's original interpretation of this statute immediately after its enactment was that the exclusionary language of the section stripped the Department of the power it previously held over generating stations constructed by electric companies.

It is the first sentence of the statute which grants to the Department the power to regulate plants "which may cause emissions into the air . . . ." That, however, is followed by the flat statement, "The aforesaid provisions of this section shall not apply . . . to generating stations constructed by electric companies." The overall scheme of the Act is for the Public Service Commission to be vested with the sole power and authority to approve on behalf of the State of Maryland the erection of electric generating stations. This approval includes all matters involving or concerned with environmental impact. From the combination of the flat — unambiguous — sentence in the statute purporting to exempt generating stations of electric companies from its permit requirements, the legislative scheme, and the initial interpretation of the statute by the agency, we conclude that the better view is that § 706 vests the Department with no control at any time over "generating stations constructed by electric companies." Chief Judge Prescott said for the Court in *Amalgamated Ins. v. Helms,* 239 Md. 529, 534, 212 A. 2d 311 (1965), "[C]onstruing a statute liberally and adding to it, by judicial fiat, a provision which the Legislature did not see fit to include are not one and the same thing." We decline to add words to the statute.

> *Judgment reversed; case remanded for entry of a declaratory judgment consistent with this opinion; appellee to pay the costs.*