758 A.2d 124

**TOTAL AUDIO–VISUAL SYSTEMS, INC.**

v.

**DEPARTMENT OF LABOR, LICENSING AND REGULATION, et al.**

**No. 145, Sept. Term, 1999.**

Court of Appeals of Maryland.

Aug. 25, 2000.

Claire O. Ducker, Sr., Locust Grove, VA (S. Curt Hansen, Washington, DC), all on brief, for Appellant.

Matthew W. Boyle, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Md., on brief), Baltimore, for Appellees.

Argued before BELL, C.J., and ELDRIDGE, RÓDOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

BELL, Chief Judge.

This case is an appeal from a grant of unemployment benefits awarded to the claimant, Gary C. Miller ("Miller"), based upon his employment with the petitioner, Total Audio–Visual System. Despite opposition from the petitioner, the Board of Appeals for the Department of Labor, Licensing, and Regulation ("DLLR") determined that there was "good cause" for the claimant's voluntary resignation of his job with the petitioner, construing that phrase, as used in Md. Code Ann., Labor and Employment § 8–1001 (1991, 1999 Repl.Vol.),[1] to include those situations in which an employee voluntarily leaves one job for a better one, and affirmed the award of benefits. The Circuit Court for Montgomery County agreed. We issued the writ of certiorari on our own motion to consider whether, under the Labor and Employment Article, an employee is entitled to unemployment benefits on the basis of his or her employment with a previous employer where that employee voluntarily resigned a permanent and satisfactory job with that previous employer in order to take a job with another employer. Because we conclude that, under the circumstances of this case, the claimant was not entitled to unemployment compensation on the basis of his employment with the petitioner, we shall reverse the judgment of the Circuit Court.

## I.

For approximately one year, the claimant was employed by the petitioner in a managerial position. His salary was $32,000.00 per year plus one percent of the petitioner's net profits. During the latter part of that year, the claimant received an offer of employment from Projection Incorporated

---

1. All future references shall be to the 1999 Replacement Volume and as to the Labor and Employment Article, unless otherwise stated.

("Projection"), a company engaged in business similar to that of the petitioner. The offer included an $8,000.00 increase in pay, plus one percent of that company's gross profits. When the petitioner declined to match the offer, the claimant voluntarily resigned from his position with the petitioner and began working for Projection. Shortly after commencing work at Projection, however, the claimant was laid off through no fault of his own.[2]

The claimant applied for unemployment benefits with DLLR based, however, on his work history with the petitioner. The initial claims specialist denied the benefits, finding both that the claimant was not eligible for benefits based upon his short work history with Projection and that he had left his employment with the petitioner voluntarily and without good cause within the meaning of § 8–1001 of the Labor and Employment Article. The claimant appealed and, after a *de novo* hearing, the Hearing Examiner found that because the claimant left his employment with the petitioner for what he considered better employment, including an $8,000.00 pay raise, there was good cause and, thus, the claimant was entitled to receive unemployment compensation under § 8–1001. The petitioner appealed the Hearing Examiner's decision to the Board of Appeals of the DLLR, which affirmed the decision of the Hearing Examiner. He then sought judicial review in the Circuit Court for Montgomery County, which also affirmed the award of benefits. Next, the petitioner appealed to the Court of Special Appeals, but before that court considered the matter, we granted certiorari to address the important issue of first impression that this case presents.

## II.

In this Court, the petitioner argues that unemployment benefits should not have been granted to the claimant. It

---

**2.** There is an allegation that the petitioner threatened to sue Projection and that, for that reason, Projection laid the claimant off. Whether true or not, that is not a matter that is before this Court and thus can play no role in the decision of this case.

argues that the governing statutes, § 8–1001 and § 8–611 of the Labor & Employment Article, clearly disqualify the claimant from receiving benefits. Specifically, it contends that there was nothing in, or about, the claimant's job with the petitioner that precipitated his leaving and that it would be *argumentum ad absurdum* to contend that voluntarily leaving a permanent and satisfactory job for what the claimant believes to be a better job can be considered a "valid circumstance," defined in § 8–1001(c)(1)(ii) as "of such necessitous or compelling nature that the individual has no reasonable alternative other than leaving the employment," for awarding benefits. Accordingly, it urges this Court to reverse the judgment of the Circuit Court.

DLLR conversely argues that unemployment benefits were properly awarded in this case precisely because a claimant who leaves a position for other employment with similar responsibilities and substantially better pay has left with good cause under § 8–1001. Further, DLLR contends that the Board's interpretation of § 8–1001 is consistent with the plain language of the statute, its legislative history, and the remedial nature of the Unemployment Insurance Law. Moreover, citing *Board of Educ. of Montgomery County v. Paynter*, 303 Md. 22, 491 A.2d 1186 (1985) and cases from other jurisdictions, it argues that the Board's decision is consistent with the standard set by this Court, as well as the decisions of other state courts addressing the issue, that leaving one's job to accept better employment is a cause which would impel the average, reasonable worker to leave his or her job. Accordingly, it urges this Court to affirm the judgment of the Circuit Court.

We agree with the petitioner. Because §§ 8–1001 and 8–611 are clear and unambiguous, and the meaning derived from the words the Legislature chose to use to express its intent is both reasonable and logical, we hold that the claimant in this case is not eligible for unemployment benefits based upon his employment with the petitioner. Therefore, we shall reverse the judgment of the Circuit Court.

## III.

At the outset, we review the process of awarding unemployment benefits in Maryland. Title 8 of the Labor and Employment Article is the codification of unemployment law under Maryland's statutory scheme. Pursuant to § 8–806,[3] when an individual applies for unemployment insurance benefits under § 8–805, a DLLR claims specialist and then a Hearing Examiner reviews the reasons for that individual's separation from any employer during that individual's "base period." The Legislature defines "base period" as "the first 4 of the last 5 completed calendar quarters immediately preceding the start of the benefit year," *see* § 8–101(b), and classifies each employer during the base period as a "base period employer." *See* § 8–101(c). Pursuant to § 8–611(b), when a former employee applies for unemployment benefits, every former employer within the State in that base period can be charged for benefits paid to that former employee. If, however, the claimant has separated from any of his or her base period employers for a disqualifying reason, *see* §§ 8–1001, 8–1002, 8–1002.1, 8–1003, he or she is disqualified from receiving unemployment insurance benefits. Section 8–806 also allows for such a determination to be referred first to a hearing examiner and ultimately to be decided by the DLLR Board of Appeals.

---

3. Section 8–806 states in relevant part:
   (a) *In general.*—(1) Except as provided in subsection (b) of this section a claims examiner promptly shall make a determination on a claim filed under § 8–805(a) of this subtitle.
   (2) Whenever a determination involves resolution of a dispute of material fact, a claims examiner shall:
   (i) conduct a predetermination proceeding; and
   (ii) give each party notice of the time and place of the proceeding.
   (b) *Referral to Board of Appeals.*—(1) A claim shall be referred to the Board of Appeals if determination of the claim involves:
   (i) a disqualification based on a stoppage of work due to a labor dispute;
   (ii) multiple claims; or
   (iii) a difficult issue of fact or law.

This Court's review of the DLLR Board of Appeals decision is limited. As we have said, in reviewing the decision of an administrative agency:

> [A] reviewing court, be it a circuit court or an appellate court, shall apply the substantial evidence test to the final decisions of an administrative agency, but it must not itself make independent findings of fact or substitute its judgment for that of the agency. Of course, a reviewing court may always determine whether the administrative agency made an error of law. Therefore, ordinarily, the court reviewing a final decision of an administrative agency shall determine the legality of the decision and whether there was substantial evidence from the record as a whole to support the decision.

*Board of Educ. of Montgomery County v. Paynter,* 303 Md. 22, 35, 491 A.2d 1186, 1192–93 (1985). But we also pointed out in *Office of People's Counsel v. Maryland Public Service Com'n,* 355 Md. 1, 14, 733 A.2d 996, 1003 (1999)(quoting *Commissioners of Cambridge v. Eastern Shore Public Serv. Co.,* 192 Md. 333, 339, 64 A.2d 151, 154 (1949) and citing *Mayor & Council of Crisfield v. Public Serv. Comm'n,* 183 Md. 179, 189, 36 A.2d 705, 710 (1944) and *Baltimore Gas and Elec. Co. v. Dep't of Health and Mental Hygiene,* 284 Md. 216, 395 A.2d 1174 (1979)), that "[q]uestions of law, however, are 'completely subject to review by the courts,' ... although the agency's interpretation of a statute may be entitled to some deference." *See also, Board of Physician Quality Assurance v. Banks,* 354 Md. 59, 69, 729 A.2d 376, 381 (1999); *Liberty Nursing Center, Inc. v. Department of Health & Mental Hygiene,* 330 Md. 433, 443, 624 A.2d 941, 946 (1993). That deference, however, is by no means dispositive, nor otherwise as great as that applicable to factual findings or mixed questions of law and fact. *Baltimore Bldg. and Constr. Trades Council v. Barnes,* 290 Md. 9, 14, 427 A.2d 979, 982 (1981). As the issue in the case *sub judice* is solely a question of statutory interpretation, we review the agency's determination *de novo.*

It is well-settled that a statute is itself the best evidence of its own meaning. *Board of License Comm'rs for Charles County v. Toye*, 354 Md. 116, 122, 729 A.2d 407, 410 (1999); *Read v. Supervisor of Assessments of Anne Arundel County*, 354 Md. 383, 392–93, 731 A.2d 868, 873 (1999); *Resper v. State*, 354 Md. 611, 618–19, 732 A.2d 863, 867 (1999). Indeed, we have said many times that the process of statutory interpretation begins with, and frequently ends with, the words of the statute. *See, McNeil v. State*, 356 Md. 396, 404, 739 A.2d 80, 85 (1999); *Schuman, Kane, Chartered v. Aluisi*, 341 Md. 115, 119, 668 A.2d 929, 931 (1995); *Baltimore v. Cassidy*, 338 Md. 88, 93, 656 A.2d 757, 760 (1995) (citing *Harris v. State*, 331 Md. 137, 145, 626 A.2d 946, 950 (1993)). Therefore, where statutory language is clear and unambiguous, according to its ordinary and commonly understood meaning, *see Chesapeake and Potomac Tel. Co. of Maryland v. Director of Finance for Mayor and City Council of Baltimore*, 343 Md. 567, 578, 683 A.2d 512, 517 (1996), a court must so construe the statute, rather than resort to legislative history or other extraneous considerations to arrive at a contrary construction. *Toye*, 354 Md. at 122, 729 A.2d at 410; *Giant Food, Inc. v. Department of Labor Licensing and Regulation*, 356 Md. 180, 188–189, 738 A.2d 856, 860 (1999); *Sears, Roebuck & Co. v. Gussin*, 350 Md. 552, 564, 714 A.2d 188, 193 (1998); *Coleman v. State*, 281 Md. 538, 546, 380 A.2d 49, 54 (1977); *Kaczorowski v. Mayor of Baltimore*, 309 Md. 505, 515, 525 A.2d 628, 633 (1987); *Compare, Taylor v. Friedman*, 344 Md. 572, 582, 689 A.2d 59, 63 (1997) (even when language of a statute is plain and unambiguous, court may look to a legislative purpose to support or confirm plain meaning).

Section § 8–1001 expressly provides:

(a) *Grounds for disqualification.*—(1) An individual who otherwise is eligible to receive benefits is *disqualified* from receiving benefits *if the Secretary finds that unemployment results from voluntarily leaving work without good cause.*

(2) A claimant who is otherwise eligible for benefits from the loss of full-time employment may not be disqualified from the benefits attributable to the full-time employment

because the claimant voluntarily quit a part-time employment, if the claimant quit the part-time employment before the loss of the full-time employment.

(b) *Finding of good cause.* The Secretary may find that a cause for voluntarily leaving is good cause *only* if:

(1) *the cause is directly attributable to, arising from, or connected with:*

(i) *the conditions of employment; or*

(ii) *the actions of the employing unit; or*

(2) an individual:

(i) is laid off from employment through no fault of the individual;

(ii) obtains subsequent employment that pays weekly wages that total less than 50% of the weekly wage earned in the employment from which the individual was laid off; and

(iii) leaves the subsequent employment to attend a training program for which the individual has been chosen that:

1.  is offered under the Maryland Job Training Partnership Act; or

2.  otherwise is approved by the Secretary.

(c) *Valid circumstances.*—(1)  A circumstance for voluntarily leaving work is valid *only* if it is:

(i) a *substantial cause* that is directly attributable to, arising from, or connected with conditions of employment or actions of the employing unit; or

(ii) of such *necessitous or compelling nature* that the individual has *no* reasonable alternative other than leaving the employment.

(2) For determination of the application of paragraph (1)(ii) of this subsection to an individual who leaves employment because of the health of the individual or another for whom the individual must care, the individual shall

submit a written statement or other documentary evidence of the health problem from a hospital or physician.

(d) *Required disqualification.*—in addition to other circumstances for which a disqualification may be imposed, neither good cause nor a valid circumstance exist and a disqualification shall be imposed if an individual leaves employment:

(1) to become self-employed;

(2) to accompany a spouse to a new location or to join a spouse in a new location; or

(3) to attend an educational institution.

(Emphasis added).

■ A plain reading of § 8–1001 makes clear that leaving employment for a better paying job does not constitute "good cause." Subsection (a) makes it indisputably clear that an individual, whom the Secretary finds has voluntarily left employment without good cause is disqualified from receiving unemployment benefits. Conversely, also inferred from subsection (a)(1) is that unemployment benefits are payable to an employee who leaves employment voluntarily, but for good cause. In subsection (b), the Legislature defined "good cause" in terms of two permitted and definitive findings. Subsection (b)(1) permits the Secretary to find good cause only if the reason the employee voluntarily left employment "is directly attributable to, arising from, or connected with" either a condition of employment or an action of the employment unit. Under subsection (b)(2), the Secretary may make a good cause finding only if an employee, laid off without fault, voluntarily left subsequent employment paying less than half what the position from which he or she was laid off paid, to attend a training program for which he or she has been selected, offered by the Maryland Job Training Partnership Act or approved by the Secretary. Because the claimant was not laid off by the petitioner and, indeed, admits leaving his employment with the petitioner for a job paying a better wage, it is clear and the parties agree, that the claimant was not, and cannot be, eligible for benefits under subsection (b)(2). There-

fore, good cause must be found, if at all, under subsection (b)(1).

Under subsection (b)(1), to be good cause, the reason for voluntarily leaving employment must be job related, *see Paynter, supra,* 303 Md. at 29, 491 A.2d at 1189–90 (1985), and more particularly, relate to the conditions existing on the claimant's job or involve acts by the claimant's employment unit. *See* § 8–1001(b)(1). An offer of greater pay by another employer to induce the claimant's voluntary termination does not qualify; because such offers are conditions of the offered employment and thus only relate to the conditions of the future employment. Although, to be sure, while affecting employment conditions generally, and, perhaps, the claimant's employment in some way, they surely are not "directly attributable to, arising from or connected with" the conditions existing in the employing unit from which the claimant resigned. If an offer of greater pay can be "good cause" for an employee voluntarily to terminate otherwise satisfactory employment, then any condition of future employment which compares favorably with the claimant's present employment and is offered and accepted, as an inducement to the claimant to leave that employment, must also be considered "good cause."

This Court's holding in *Paynter* confirms this interpretation. There, the application of Md. Ann. Code art. 95A, § 6 (1957, 1979 Repl.Vol.), the predecessor to § 8–1001(a), to a school teacher who resigned as a result of what he alleged to be, and described as, harassment was before the Court. *Paynter,* 303 Md. at 26, 491 A.2d at 1188. At that time, § 6(a), as relevant, prescribed when an individual was disqualified for unemployment benefits, as follows:

(a) If the Executive Director [4] finds that the individual's unemployment is due to his leaving work voluntarily without

---

4. Md. Ann. Code art. 95A, § 11(a) (1957, 1979 Repl.Vol.1984 Cum. Supp.) directed that "[w]herever in this article the word 'Executive Director' appears, it shall be construed to mean the Secretary of Employment and Training."

good cause. Only a cause which is directly attributable to, arising from, or connected with the conditions of employment or actions of the employer may be considered good cause.... Leaving work to become self-employed, to accompany or join one's spouse in a new locality, or to attend an educational institution is neither good cause nor a valid circumstance for voluntarily leaving work. Only a substantial cause which is directly attributable to, arising from, or connected with the conditions of employment or actions of the employer, or another cause of such a necessitous or compelling nature that the individual had no reasonable alternative other than to leave the employment may be considered a valid circumstance.... [5]

Having concluded that the provisions of § 6(a) were unambiguous, we upheld the determination of the agency, affirmed by the Circuit Court, that the claimant's resignation was for good cause. We explained:

The Board of Education would have the "necessitous or compelling" provision related in the statute to valid circumstance apply equally to good cause. To do otherwise, it states, would result in a more onerous standard for the payment of limited benefits than for the payment of full benefits. This, it suggests, would be absurd in light of the purposes of the Unemployment Insurance Law and the policy regarding it announced by the legislature. (Citation omitted). The invalidity of the argument of the Board of Education is readily apparent on the face of the statute. Neither good cause nor valid circumstance may be predicated upon a purely personal reason. But, although the statute commands that good cause be job-related, it recognizes a cause in addition to one that is job-related with respect to a valid circumstance. It is this alternative cause provided with respect to valid circumstance, and not applicable to

---

**5.** Although formatted differently, the provisions of former § 6(a) and § 8–1001(a) are substantively the same. Indeed, the Special Revisor's note to § 8–1001 so reflects. *See* Md. Code Ann., Labor and Employment § 8–1001 (1991).

good cause, which must meet the "necessitous or compelling" test. Provision for the additional cause as to valid circumstance is clearly spelled out in the statute when it prescribes:

> "Only a substantial cause which is directly attributable to, arising from, or connected with the conditions of employment or actions of the employer, *or another cause* of such necessitous or compelling nature that the individual had no reasonable alternative other than to leave the employment may be considered a valid circumstance." (Emphasis added).

The obvious rationale for the strict test required as to this alternative non-job-related cause is that if the employer must contribute to the payment of benefits arising from a cause not connected with the claimant's employment or the employer's actions, that cause should have a higher standard of proof. It is perfectly plain from the statutory language that the legislature did not intend that the necessitous or compelling requirement apply to good cause.

*Id.* at 29–30, 491 A.2d at 1190.

Similarly in *Berdych v. Department of Employment and Training,* 69 Md.App. 484, 518 A.2d 462 (1986), the intermediate appellate court observed:

> Under that standard, DET must not permit a claimant to receive unemployment benefits unless his reasons for leaving the job were "directly attributable to, arising from, or connected with the conditions of employment or actions of the employer." ... The manifest meaning of the statute requires that a claimant's reasons be job-related.

(Citations omitted).

■ The statutory scheme under § 8–1001 remains as it was when *Paynter* was decided and, as it did then, supports the interpretation the *Paynter* Court gave § 6(a). Subsection (c) continues to place circumstances for voluntarily leaving work into two categories and to draw a distinction between those that are work related and those that are not work related. Not being directly related to, attributable to or

connected with the employee's employment or the actions of that employing unit, offers of higher pay as an inducement to leave existing employment must fall, if at all, into this latter category. As such, as *Paynter* makes clear, 303 Md. at 29, 491 A.2d at 1189–90, in order to be a valid circumstance, an offer of higher pay must meet the "necessitous and compelling" test. This is a stricter test than the test for good cause; more needs to be shown than that the precipitating event or cause "would reasonably [have] impel[led] the average able-bodied qualified worker to give up his or her employment." *Id.* at 36–37, 491 A.2d at 1193, *quoting Uniweld Products, Inc. v. Indus. Relations Comm'n, Etc.,* 277 So.2d 827, 829 (Fla. App. 4 Dist.1973).

Subsection (d), with its absolute disqualifications, provides further support, if any additional is necessary, for a construction of § 8–1001 to preclude benefits in this case. By denying unemployment benefits to employees who leave work to go into business, to relocate with a spouse or to go to school, that section makes clear that purely personal reasons for leaving work will not suffice as a predicate for unemployment benefits. It is difficult to reconcile, except on that basis—going into business for oneself is a personal matter—why the Legislature would permit an employee, who voluntarily terminates permanent and otherwise satisfactory employment for increased wages, on the theory that his or her prospects and financial condition are thereby improved, to be eligible for unemployment benefits, while at the same time denying the same right to a claimant, who, for the same reasons, voluntarily leaves work to go into business for him or herself. Accepting more money and changing jobs is as much of a gamble and thus, as much of a personal matter, as going into business for oneself. In our view, it is unmistakably clear that § 8–1001(a) was not designed to provide benefits when the precipitating cause for the voluntary leaving of the employment was for higher pay or a better job. Instead, it was designed to prevent hardship to persons who lose their jobs, through no fault of their own. That intent is clear in § 8–102 of the Labor and Employment Article which provides:

(a) *Interpretation and application.*—This section is a guide to the interpretation and application of this title.

(b) *Findings.*—The General Assembly finds that:

(1) economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of the State;

(2) *involuntary* unemployment is a subject of general interest and concern that requires appropriate action by the General Assembly to prevent the spread of *involuntary* unemployment and to lighten its burden, which often falls with crushing force on the unemployed worker and the family of the unemployed worker;

(3) the achievement of security for society requires protection against *involuntary* unemployment, which is the greatest hazard of our economic lives; and

(4) security for society can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, maintaining the purchasing power, and limiting the serious social consequences of poor relief assistance.

(c) *Statement of policy.*—The General Assembly declares that, in its considered judgment, the public good and the general welfare of the citizens of the State require the enactment of this title, under the police powers of the State, for the compulsory setting aside of unemployment reserves to be used *for the benefit of individuals unemployed through no fault of their own.*

(Emphasis added).

Finally, § 8–611 is instructive and consistent. Section 8–1001(a) deals only with the reason for the claimant's unemployment and its effect on the claimant's eligibility to receive unemployment benefits; it does not address to which employer the eligibility for unemployment benefits relates. Furthermore, that section does not, and cannot be, intended to be used to calculate the allowable benefits, or to determine eligibility based upon funds available from contributions by

each base employer. In this case, the claimant voluntarily left satisfactory employment with the petitioner for a job that paid more. There is no contention that he was laid off by the petitioner, through no fault of his own, or that he left to attend a qualified training program. Nor is there evidence, not to mention an allegation, that there were conditions of his employment or acts by the petitioner that were adverse to, or impacted negatively on, the claimant. Section 8–1001 does not, however, address whether the period of employment with the petitioner may be used to calculate the claimant's unemployment benefits or, in other words, whether those benefits are chargeable to the petitioner, the claimant's first employer. Section 8–611 addresses those issues.

Section 8–611 is clear in its proscriptions, one of which is that, when charging against the earned rating record of each base employer, contributions of previous base employers may not be used to determine eligibility for benefits where the claimant voluntarily left that employer's employment to accept better employment. Section 8–611(b) expressly provides:

> Allocation of regular benefits.—Except as provided in subsection (d) [6] of this section, the Secretary shall charge pro rata against the earned rating record of each base period employer all regular benefits and the share of extended benefits required under subsection (c) [7] of this section in

---

6. Subsection (d) provides:

(d) *Shut downs for convenience and work sharing programs.*—The Secretary shall charge all regular and extended benefits paid to a claimant against the earned rating record of an employing unit that caused the claimant's unemployment during any period in which the unemployment is caused by:

(1) participation of the employing unit in a work sharing unemployment insurance program that the Secretary has approved; or

(2) a shutdown of the employing unit:

(i) to have employees take their vacations at the same time;

(ii) for inventory;

(iii) for retooling; or

(iv) for any other purpose that is primarily other than a lack of work and that causes unemployment for a definite period.

7. Subsection (c) provides:

the same proportion as the wages paid by the base period employer is to the total wages of the claimant during the base period, and rounded to the nearest dollar.

(Emphasis added).

Under § 8–611(e), however, "[t]he Secretary may not charge benefits paid to a claimant against the earned rating record of an employing unit if ... (4) *the claimant left employment voluntarily to accept better employment* or enter training approved by the Secretary." (Emphasis added). If, given the specific provisions of § 8–611(e)(4), the earned rating record of the employing unit which the claimant left voluntarily to accept better employment cannot be charged for the benefits payable as a result of a subsequent lay off, then it seems strange indeed that, as to that employing unit, leaving employment voluntarily to accept better employment would be considered good cause for leaving work. Thus, while, pursuant to § 8–1001(a), a claimant may be eligible for unemployment benefits, the determination whether those benefits should or may be paid is employer specific. Reading § 8–1001(a) as the appellee proposes would render § 8–611(e)(4) meaningless. *See, Fraternal Order of Police, Montgomery County Lodge No. 35 v. Mehrling*, 343 Md. 155, 180, 680 A.2d 1052, 1065 (1996) ("[n]or should we interpret a statutory scheme so as to render any part of it meaningless or nugatory.").

To be sure, the claimant may well have voluntarily left his employment with the petitioner and he may well have done so for good cause, at least from a practical, and even common

---

*Allocations of extended benefits.*—(1) Notwithstanding any other provision of this title, the Secretary may not charge against the earned rating record of an employing unit an extended benefit payment for which the State receives full reimbursement from the federal government.

(2) Except as provided in subsection (d) of this section, the appropriate share of extended benefits:

    (i) for a governmental entity, is all extended benefits paid to a claimant; and

    (ii) for other employing units, is 50% of extended benefits paid to a claimant.

sense, point of view. However, he was not, at the time of his voluntary departure eligible for unemployment benefits because the claimant left his employment with the petitioner for other employment and, in fact, entered into that employment. Therefore, the petitioner could not, at that time, have received unemployment benefits for the simple and inescapable reason that he was employed. That he subsequently becomes unemployed, and therefore eligible, because of the actions of the subsequent employer does not change the situation. The claimant's unemployment results from the subsequent employer's laying him off and not from the petitioner's actions. Rather, it was the claimant's inadvertent actions which led to his unemployment through the, perhaps very reasonable, acceptance of employment that supposedly paid better.

In conclusion, the appellee misconstrues § 8–1001 because it is clearly written to preclude the award of benefits for voluntarily leaving employment for greater pay. Accordingly, we reverse the judgment of the Circuit Court for Montgomery County.

JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE THE ORDER OF THE BOARD OF APPEALS OF THE DEPARTMENT OF LABOR, LICENSING AND REGULATION AND REMAND TO THAT AGENCY WITH INSTRUCTIONS TO DENY THE CLAIMANT'S APPLICATION FOR UNEMPLOYMENT BENEFITS. COSTS TO BE PAID BY THE APPELLEE.

Dissenting opinion by CATHELL, J., joined by ELDRIDGE and RAKER, JJ.

CATHELL, Judge, dissenting.

I respectfully dissent.

The majority has completely misconstrued the statutory scheme the Legislature has created to protect Maryland workers from the trauma of unemployment. In simplified terms, the Legislature has created a scheme that denies benefits to

employees who, in general terms, have committed some wrongful action that results in their unemployment. An otherwise qualified employee, however, is entitled to benefits if he becomes unemployed through no fault of his or her own. The scheme requires that benefits paid to an employee who becomes unemployed through no fault or wrong of his own, but through the wrongful or neutral conduct, *i.e.*, business requirements, of a base employer be chargeable against that employer. That is a simple concept.

The Legislature, in its wisdom, has also recognized that it is possible for an employee to become unemployed through no fault of his or her own *and* through no fault of his base employer. When that occurs, the employee is still entitled to benefits pursuant to section 8–1001. Those benefits are not chargeable to the base employer because of the provisions of section 8–611. In that case, the benefits due to that employee are incorporated into the statistics that generate the overall base rate for all employers in the State. This is exactly what has, and should occur, in the case *sub judice*. Instead, the majority utterly fails to comprehend the concept.

This case involves simply whether a worker is entitled to benefits. It is not a case about a charge back against a specific employer. It does not involve the application of section 8–611. The majority states:

> Section 8–1001 does not ... address whether the period of employment with the petitioner may be used to calculate the claimant's unemployment benefits or, in other words, whether those benefits are chargeable to the petitioner, the claimant's first employer.

This simply is incorrect. That specific question is in no way relevant to the only issue before the Court. As the majority discusses earlier in its opinion, this case concerns whether a former employee is entitled to benefits. By "piggybacking" the two concepts, the majority uses a statute not at issue in this case to misinterpret the statute actually at issue.[1] The

---

1. In marlin fishing, it is customary to drag behind a fishing boat an object with no hooks on it that is designed to attract marlin to the area

appellant, as appellee concedes, *cannot be charged* with any benefits paid to Miller *precisely because of the provisions of* section 8–611.[2] The presentation of section 8–611 is a "red herring" designed for two simple functions: to confuse the issue; to confuse the Court. Obviously, it has functioned as intended. Section 8–611 issues are simply not in this case. They perhaps are for another case, but, not this case.

Under the circumstances of this case, if it was a section 8–611 case, appellant would prevail. The benefits, by statute, are not chargeable against appellant's rating. The department has not made any such charge; there has been no administrative finding in that regard. Thus, this issue is simply not appealable because there is no administrative decision for us to review in respect to section 8–611. To the extent appellant is seriously trying to raise the issue, it is appealing an apparition ("something appearing only in the viewer's perception").

The language of section 8–1001, *supra,* the only statute governing the issue in this case, provides in relevant part:

---

of the boat. It is called a 'teaser.' When a marlin appears at the 'teaser,' the baits are brought near the 'teaser,' it is removed, and it is hoped the marlin will switch to one of the baits with a hook on it. The appellant in the case *sub judice* left the 'teaser' in the water and the majority has grabbed the 'teaser' and will not let go!

2. The majority states:

[E]ven if § 8–1001 were interpreted as the appellee urges, it does not, and cannot, apply in the present case....

. . . .

From the foregoing it is clear that § 8–1001(a) deals only with the reason for the claimant's unemployment and its effect on ... eligibility ...; it does not address to which employer the eligibility for unemployment benefits relates.

This case has nothing to do with which employer is the base employer. The entire scope of the majority's opinion is based on charge backs to employers. That issue is simply not in this case! The law specifically says that there can be no charge backs against employers' earned rating records, stating in subsection (e)(4) that benefits not chargeable include instances where a "claimant left employment voluntarily to accept better employment...." Neither party in this case disputes that the employee left for better employment.

(a) *Grounds for disqualification.*—(1) An individual who otherwise is eligible to receive benefits is disqualified from receiving benefits if the Secretary finds that unemployment results from voluntarily leaving work without good cause.

. . . .

(b) *Finding of good cause.*—The Secretary may find that a cause for voluntarily leaving is good cause only if:

(1) The cause is directly attributable to, *arising from,* or *connected with:*

(i) *the conditions of employment;* or

(ii) the actions of the employing unit; or

. . . .

(c) *Valid circumstances.*—(1) A circumstance for voluntarily leaving work is valid only if it is:

(i) a substantial cause that is directly attributable to, *arising from, or connected with conditions of employment* or actions of the employing unit. . . . [Some emphasis added.]

The stating of the emphasized language at issue, in my mind, virtually automatically creates the question, "What does it mean?" The language of the statute is not the equivalent of an unambiguous statement, *i.e.,* "The earth rotates." It is not, as the majority proffers, unambiguous.

In my view, the language of the statute is replete with ambiguity, calling for interpretation and construction. As I shall indicate, the legislative history of the *relevant statutes* leads to a completely contrary meaning to that attributed to the statutes by the majority. The appellee ignored section 8–611(e) because it has never been in this case until the majority succumbed to the appellant's blatant, albeit successful, attempt to interject an issue not previously presented to or determined by any lower judicial or administrative entity. Section 8–611(e) should be ignored until such time as an administrative proceeding involving its applicability finds its way to this Court. Given the concession at oral argument and in its brief, appellee would, in all likelihood, also be judicially

estopped from even attempting to charge the benefits at issue against appellant's rating. No one, not an administrative agency, not a reviewing trial level court, nor until the majority misapplies it in this case, has ever been presented with, or ever made any findings in respect to section 8–611(3). Yet the majority, in essence, reverses the trial court's, and the agency's, position that the employee is entitled to benefits, basing its reversal on some type of judicial creationism.

The majority is answering a question not asked. It is answering a question conceded, and, in total, its answer is wrong. The appellee has conceded, and the provisions of section 8–611(e)(4) forbid a charge back against the employer. The section specifically says that the benefits may not be charged back if the claimant "left employment voluntarily to accept better employment." The claimant did just that. No one is trying, arguing, suggesting, or otherwise asserting that there is a charge back against appellant. There is no challenge of this nature to be resolved—the appellee is not doing, has no plans to do, concedes it cannot do, that which the majority, unnecessarily, tells it, it cannot do. And in the process, because of its concerns on that unpresented issue, the majority resolves a completely unrelated issue (the only one in the case) incorrectly.

Even if the majority were correct in holding (as opposed to having power to hold) that the language of section 8–1001 (as opposed to the non-issue language of section 8–611) is unambiguous, the result it reaches today is still not logically sustainable. Under the majority's position, matters of a low or lower salary at the place of present employment are not connected to, nor do they arise from conditions of employment. If the Legislature wants to adopt the illogical position that such salary matters do not relate to conditions of employment, it has the power to do so. It would still be illogical, but it would be sustainable based upon what would then be the legislative history of the statute.

The majority refers to the provision that an employee who has left employment to become self-employed is not entitled to

benefits, offering it to argue that it would be "difficult to reconcile" why the Legislature could have meant for an employee who leaves one employer for another, to receive benefits, stating "[a]ccepting more money and changing jobs is as much of a gamble and, thus, as much of a personal matter, as going into business oneself."

The two, in my view, are completely, and easily, reconcilable. An employee going to another job as an employee remains in the workforce as an employee entitled to benefits pursuant to statute. A former employee, who goes into business for himself or herself, is no longer an employee—he or she is an employer. Employers are not generally entitled to benefits under the system.

I reiterate that this case arises from a decision granting unemployment insurance benefits to Gary C. Miller, appellee, *and not from any decision finding that those benefits are chargeable to appellant.* From approximately November 1, 1996 to October 30, 1997, appellee was employed by Total Audio–Visual Systems, Inc. (TAV), appellant, as manager of its Silver Spring Branch office. His salary was $32,000.00 per year plus one percent of the company's net profits. In the end of October 1997, he received an offer of employment from Projection Incorporated (Projection), which included an annual $8,000.00 increase in base pay. In response to this offer, after TAV declined to match it, appellee voluntarily resigned from his job with TAV and began working for Projection. Shortly after commencing work at Projection, his employment contract with Projection was terminated.

Appellee applied for unemployment benefits with the Department of Labor, Licensing, and Regulation (DLLR). The initial claims specialist found that he had voluntarily left his employment at TAV without good cause within the meaning of Maryland Code (1991, 1999 Repl.Vol.), section 8–1001 of the Labor and Employment Article[3] and thus was disqualified

---

**3.** All future reference to sections in the Labor and Employment Article refer to the 1999 Replacement Volume, unless otherwise stated.

*from* receiving such benefits. Mr. Miller appealed and on August 17, 1998, a DLLR Hearing Examiner conducted a *de novo* hearing on this matter. On August 20, 1998, the Hearing Examiner found that because Mr. Miller was leaving for better employment and an $8,000.00 pay raise, that he left with good cause, and thus was entitled to unemployment compensation under section 8–1001. TAV appealed the Hearing Examiner's decision to the Board of Appeals of the DLLR. The only issue raised at this time was the employee's entitlement to benefits. *The section 8–611 issues were not on the table.* On November 17, 1998, the Board affirmed the decision of the Hearing Examiner. TAV sought judicial review to the Circuit Court for Montgomery County. On August 26, 1999, the Circuit Court sustained the decision of the Board of Appeals. TAV appealed to the Court of Special Appeals. On our own motion, we granted review prior to argument in the Court of Special Appeals. TAV presents only one issue to this Court. That issue did not concern who—or what—employer, if any, would be charged with benefits. The issue presented was:

> Where an employee voluntarily resigns from a permanent and satisfactory job in order to take a job with another employer, but then is quickly terminated by the second employer, is the employee entitled to unemployment compensation on the basis of his [or her] employment with the first employer?

The primary issue concerns the meaning of the provision "the Secretary may find that a cause for voluntarily leaving is good cause only if: (1) the cause is directly attributable to, or arising from, or connected with: (i) the conditions of employment. . . ." It is apparent to me that the clause is not clearly unambiguous. Accordingly, keeping in mind the language of the statute, I commence my analysis of that provision of section 8–1001 by attempting to ascertain the intent of the Legislature. As we said in *State v. Bell,* 351 Md. 709, 720 A.2d 311(1998):

> We have said that "[t]he cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the

legislature." *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423, 429 (1995). Legislative intent must be sought first in the actual language of the statute. *Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.,* 346 Md. 437, 444–45, 697 A.2d 455, 458 (1997); *Stanford v. Maryland Police Training & Correctional Comm'n,* 346 Md. 374, 380, 697 A.2d 424, 427 (1997) (quoting *Tidewater v. Mayor of Havre de Grace,* 337 Md. 338, 344, 653 A.2d 468, 472 (1995)); *Coburn v. Coburn,* 342 Md. 244, 256, 674 A.2d 951, 957 (1996); *Romm v. Flax,* 340 Md. 690, 693, 668 A.2d 1, 2 (1995); *Oaks,* 339 Md. at 35, 660 A.2d at 429; *Mauzy v. Hornbeck,* 285 Md. 84, 92, 400 A.2d 1091, 1096 (1979); *Board of Supervisors v. Weiss,* 217 Md. 133, 136, 141 A.2d 734, 736 (1958). Where the statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, courts normally do not look beyond the words of the statute to determine legislative intent. *Marriot Employees,* 346 Md. at 445, 697 A.2d at 458; *Kaczorowski v. Mayor of Baltimore,* 309 Md. 505, 515, 525 A.2d 628, 633 (1987); *Hunt v. Montgomery County,* 248 Md. 403, 414, 237 A.2d 35, 41 (1968).

. . . .

This Court recently stated that "statutory language is not read in isolation, but 'in light of the full context in which [it] appear[s], and in light of external manifestations of intent or general purpose available through other evidence.'" *Stanford v. Maryland Police Training & Correctional Comm'n,* 346 Md. 374, 380, 697 A.2d 424, 427 (1997) (alterations in original) (quoting *Cunningham v. State,* 318 Md. 182, 185, 567 A.2d 126, 127 (1989)). To this end,

[w]hen we pursue the context of statutory language, we are not limited to the words of the statute as they are printed. . . . We may and often must consider other "external manifestations" or "persuasive evidence," including a bill's title and function paragraphs, amendments that occurred as it passed through the legislature, its relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue

of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case.

... [I]n *State v. One 1983 Chevrolet Van*, 309 Md. 327, 524 A.2d 51 (1987), ... [a]lthough we did not describe any of the statutes involved in that case as ambiguous or uncertain, we did search for legislative purpose or meaning—what Judge Orth, writing for the Court, described as "the legislative scheme." [*Id.* at] 344–45, 524 A.2d at 59. We identified that scheme or purpose after an extensive review of the context of Ch. 549, Acts of 1984, which had effected major changes in Art. 27, § 297. That context included, among other things, a bill request form, prior legislation, a legislative committee report, a bill title, related statutes and amendments to the bill. *See also Ogrinz v. James*, 309 Md. 381, 524 A.2d 77 (1987), in which we considered legislative history (a committee report) to assist in construing legislation that we did not identify as ambiguous or of uncertain meaning.

*Kaczorowski*, 309 Md. at 514–15, 525 A.2d at 632–33 (some citations omitted).

*Id.* at 717–19, 720 A.2d at 315–16 (some alterations in original).

The wording of section 8–1001, paragraph (b)(1), controls the determination of "good cause" in the case at bar. As I have indicated, the crucial wording is "a cause for voluntarily leaving is good cause only if: (1) the cause is ... arising from, or connected with: (i) the conditions of employment; *or* (ii) the actions of the employing unit." (Emphasis added.) This case, contrary to the position of the majority, does not concern the clause "(ii) the actions of the employing unit." Everybody agrees the employer did not do anything wrong. By use of the disjunctive "or" between 1 and 1(i), and (ii), the two sections are completely independent. There simply is no requirement of employer wrongdoing in order for an employee to have a valid reason to leave an employment so long as the reason arises from, or is connected with, the conditions of employment—and is a good reason. I respectfully submit that salary issues, *i.e.*, a lower salary at a present position, clearly

arise from and are connected with conditions of employment. I respectfully suggest, as well, that a twenty-five percent, or more, increase in salary is a good reason to take a new job.

The position of the appellee is consistent with the one exposed here, that a worker's salary is clearly a condition of employment. It posits that the worker's lower salary at the place of initial employment can be said to arise from and be connected with the conditions of that employment. Therefore, a worker's decision to leave employment voluntarily to take another job with an increase in salary may be, under proper circumstances, with "good cause." I believe that the legislative history overwhelmingly supports this logical construction of the statute.

What the Legislature intended concerning unemployment insurance benefits for employees who leave one job for a better job can be discerned by examining the evolution of section 8–1001.[4] Title 8 of the Labor and Employment Article was derived from Maryland Code (1957, 1985 Repl.Vol., 1990 Cum.Supp.), Article 95A. Article 95A, Unemployment Compensation, was originally enacted by 1936 Maryland Laws, December Special Session, chapter 1.[5] Article 95A was later recodified as Title 8 by 1991 Maryland Laws, chapter 8.

---

4. Again, section 8–611 is just not relevant to the issue presented in this case. I limit my discussion to the legislative history of the relevant statute, section 8–1001. To the argument that the reading of the statute in accordance with my views would make section 8–611 meaningless, I submit that the majority has misread the statutory scheme. Section 8–611 does not even become relevant in the first instance, until, and unless, the appellee attempts to charge back against the appellant's rating, the benefits awarded Miller, a happening that the provisions of section 8–611, as conceded by appellee, prohibit. *This case is not about section 8–611.*

5. We indicated in *Saunders v. Maryland Unemployment Compensation Board,* 188 Md. 677, 681, 53 A.2d 579, 580–81 (1947) that Maryland's unemployment compensation laws were modeled after the *Unemployment Insurance Act,* 10 & 11 George 5, chapter 30 (1920) (England). Concerning disqualifications for unemployment benefits, the *Unemployment Insurance Act, supra,* section 8 states "[a]n insured contributor . . . who voluntarily leaves his employment *without just cause,* shall be

As originally worded, Maryland Code (1939), Article 95A, section 5 [6] provided:

### Disqualification For Benefits.

1936 (Dec. Sp.Sess.), ch. 1, sec. 5.1939, ch. 278, sec. 5.

5. (An Individual Shall be Disqualified for Benefits.)

(a) For the week in which he has left work voluntarily without good cause, if so found by the Board, and for not less than the one or more than the five weeks which immediately follow such week (in addition to the waiting period), as determined by the Board according to the circumstances in each case.

Between 1939 and 1979, this statute remained relatively unchanged. A substantial change, however, occurred to Article 95A, section 6 in 1979.

1979 Maryland Laws, chapter 293, which rewrote section 6, paragraph (a), originated as Senate Bill 943 of 1979. When initially introduced on February 23, 1979, the title to the bill read:

FOR the purpose of denying a person who voluntarily stops working unemployment insurance benefits for a certain period; and allowing the Executive Director of the Employment Security Administration to consider mitigating circumstances in determining the length of the period of denial of unemployment insurance benefits; and clarifying language.

Additionally, the body of proposed section 6 was initially drafted to read as follows:

An individual shall be disqualified for benefits:

(a) For the week in which his unemployment is due to his leaving work voluntarily without good cause ATTRIBUT-

---

disqualified for receiving unemployment benefit. . . ." [Emphasis added.]

6. "Disqualification for Benefits" was moved from section 5 to section 6 by 1957 Maryland Laws, chapter 538.

ABLE TO THE EMPLOYER, if so found by the Executive Director and for not less than the four nor more than nine weeks which immediately follow such week as determined by the Executive Director in each case ACCORDING TO THE SERIOUSNESS OF THE CONFIRMED MITIGATING CIRCUMSTANCES; or until he has become reemployed and has earnings therein equal to at least ten [ (10) ] times his weekly benefit amount. [Alteration in original.]

The Fiscal Note to Senate Bill 943 dated March 3, 1979, provided the following summary of the proposed legislation:

This bill denies unemployment insurance benefits to a person who voluntarily quits his job *without good cause attributable to the employer* for the current provision of not less than 4 nor more than 9 weeks. The Executive Director is to consider mitigating circumstances in determining the length of denial. [Emphasis added.]

On March 6, 1979, Frank O. Heintz, Executive Director of the Employment Security Administration, Department of Human Resources, testified before the Senate Economic Affairs Committee concerning Senate Bill 943. He disagreed with the proposed wording of the statute, specifying, in part, that additional language "arising from or connected with the conditions of employment or actions of the employer" needed to be added in order for the statute to conform to the agency practice. He testified:

Section 6(a) of Article 95A provides that an individual shall be disqualified from unemployment insurance benefits if his unemployment is due to his leaving work voluntarily without good cause. Senate Bill 943 proposes to specify that the good cause must be a cause which is attributable to the employer. The bill also provides that the severity of the disqualification penalty which is imposed upon the individual shall be determined according to the seriousness of the confirmed mitigating circumstances surrounding his leaving work voluntarily without good cause.

I would like to emphasize to the Committee the great significance of the subject matter of this bill. Since the

inception of Maryland's Unemployment Insurance Law, Article 95A has provided a disqualification for claimants who voluntarily quit their work without good cause. The term "good cause" has never been defined in the statute. Also, few cases involving the application of Section 6(a) have been litigated before the Special Court of Appeals or the Court of Appeals, and thus there is not any binding case law which defines the meaning of good cause. In sum, the interpretation of good cause has been largely left to Agency discretion.

Historically, the Employment Security Administration has defined good cause to mean a cause attributable to and arising from the conditions of employment or actions of the employer. *Historically, the Agency has considered the following circumstances, which are attributable to and arising from the conditions of employment or actions of the employer, to be good cause for an individual to voluntarily quit his job:*

1.  conditions or actions which are unreasonably hazardous to the individual's health;

2.  conditions or actions which involve or threaten to involve the individual in illegal or immoral acts, or which are otherwise unacceptable by common standards of conduct;

3.  conditions or actions which constitute a substantial violation of the agreed upon terms of employment; or

4.  *where a claimant has a reasonable expectation of bettering his career or increasing his remuneration by quitting to take another employment, and there is a reasonable basis for the claimant to believe that he has actually obtained the alternative employment and that that employment will be of substantial duration.*

Historically, the Agency has deemed other reasons than those listed above not to be good cause, within the meaning of Section 6(a), for an individual to quit his employment. For example, to date the Agency has considered the follow-

ing circumstances not to be good cause, since the circumstances are not attributable to or directly arising from the conditions of employment or the actions of the employer:

1. a claimant quits because his/her spouse has been transferred to another place of employment;

2. the claimant quits because he has trouble making child-care arrangements;

3. the claimant quits because he has difficulty in arranging transportation;

4. the claimant quits because he needs to care for a sick or disabled spouse or parent.

In sum, currently the Agency does not consider personal reasons of the claimant, no matter how substantial or reasonable, to be good cause for voluntarily leaving his employment. Marital, filial, or other domestic obligations or circumstances of the claimant are not construed to be good cause within the meaning of Section 6(a)....

. . . .

Finally, the Agency would favor S.B. 943 if Section 6(a) were amended in the bill to read as follows:

6. An individual shall be disqualified for benefits:

(a) IF THE EXECUTIVE DIRECTOR FINDS THAT THE INDIVIDUAL'S UNEMPLOYMENT IS DUE TO HIS LEAVING WORK VOLUNTARILY WITHOUT GOOD CAUSE ATTRIBUTABLE TO THE EMPLOYER OR *ARISING FROM THE EMPLOY-MENT*. SUCH DISQUALIFICATION SHALL BE EFFECTIVE FOR THE WEEK IN WHICH THE UNEMPLOYMENT BEGAN AND SHALL CONTINUE (I) FOR NOT LESS THAN FOUR NOR MORE THAN NINE WEEKS IMMEDIATELY THEREAFTER, ACCORDING TO THE SERIOUSNESS OF VALID MITIGATING CIRCUMSTANCES AS DETERMINED IN EACH CASE BY THE EXECUTIVE DIRECTOR OR (II) UNTIL THE INDIVIDUAL HAS BECOME REEMPLOYED AND HAS EARNINGS THEREIN

EQUAL TO AT LEAST TEN TIMES HIS WEEKLY BENEFIT AMOUNT.

The first purpose of the above amendment is to make Section 6(a) clearer and more easily understandable. The second purpose is to substitute "good cause attributable to the employer or arising from the employment" in place of "good cause attributable to the employer." As previously indicated, the Agency currently defines good cause to mean circumstances attributable to the employer or arising from the employment.... Thus the usage of the phraseology is well established. [Emphasis added.]

In a letter dated March 7, 1979, the day immediately after offering his testimony, Mr. Heintz wrote to Senator Harry J. McGuirk, Chairman of the Economic Affairs Committee. He reiterated the proposed amendment to Section 6(a) with a slight alteration. The relevant portion of the suggested amendment was rephrased to read as follows:

(a) IF THE EXECUTIVE DIRECTOR FINDS THAT THE INDIVIDUAL'S UNEMPLOYMENT IS DUE TO HIS LEAVING WORK VOLUNTARILY WITHOUT GOOD CAUSE. ONLY A CAUSE WHICH IS DIRECTLY ATTRIBUTABLE TO, ARISING FROM OR CONNECTED WITH THE CONDITIONS OF EMPLOYMENT OR ACTIONS OF THE EMPLOYER MAY BE CONSIDERED GOOD CAUSE.

Mr. Heintz offered that the amendment was intended, at least in part, "to expand the phrase 'attributable to the employer' to include the more comprehensive concept of 'directly attributable to, arising from or connected with the conditions of employment or actions of the employer'."

Apparently in reaction to Mr. Heintz's suggestions, by the second reading of Senate Bill 943, the initial language had been modified to incorporate the language recommended by Mr. Heintz. When enacted by 1979 Maryland Laws, chapter 293, its title read:

FOR the purpose of denying a person who voluntarily stops working unemployment insurance benefits for a

certain period; ~~and~~ clarifying the interpretation of "good cause"; changing "reemployed" to "employed"; allowing the Executive Director of the Employment Security Administration to consider ~~mitigating~~ the circumstances in determining the length of the period of denial of unemployment insurance benefits; and clarifying language.

Additionally, the enacted Article 95A, section 6(A) read:

(A) IF THE EXECUTIVE DIRECTOR FINDS THAT THE INDIVIDUAL'S UNEMPLOYMENT IS DUE TO HIS LEAVING WORK VOLUNTARILY WITHOUT GOOD CAUSE. ONLY A CAUSE WHICH IS DIRECTLY ATTRIBUTABLE TO, ARISING FROM, OR CONNECTED WITH THE CONDITIONS OF EMPLOYMENT OR ACTIONS OF THE EMPLOYER MAY BE CONSIDERED GOOD CAUSE. THE INDIVIDUAL'S DISQUALIFICATION SHALL BE EFFECTIVE FOR THE WEEK IN WHICH THE UNEMPLOYMENT BEGAN AND SHALL CONTINUE (1) FOR NOT LESS THAN 4 NOR MORE THAN 9 WEEKS IMMEDIATELY THEREAFTER, ACCORDING TO THE SERIOUSNESS OF VALID ~~MITIGATING~~ CIRCUMSTANCES AS DETERMINED IN EACH CASE BY THE EXECUTIVE DIRECTOR OR (2) UNTIL THE INDIVIDUAL HAS BECOME REEMPLOYED AND HAS EARNINGS THEREIN EQUAL TO AT LEAST TEN TIMES HIS WEEKLY BENEFIT AMOUNT.

Prior to the recodification of Article 95A to Title 8 of the Labor and Employment Article in 1991, there were certain changes to section 6.[7] The title to 1987 Maryland Laws, chapter 261 explains that the enacted legislation was:

---

**7.** 1980 Laws of Maryland, chapter 879 added the following language to paragraph (a):

LEAVING WORK TO BECOME SELF–EMPLOYED, TO ACCOMPANY OR JOIN ONE'S SPOUSE IN A NEW LOCALITY, OR TO ATTEND AN EDUCATIONAL INSTITUTION IS NEITHER GOOD CAUSE NOR A VALID CIRCUMSTANCE FOR VOLUNTARILY LEAVING WORK.

FOR the purpose of providing that an individual who has been ~~terminated or~~ laid off, who subsequently obtains certain employment, and who leaves that subsequent employment to attend certain training programs shall be considered to have left employment for ~~a valid reason~~ *good cause* . . . .

---

1981 Maryland Laws, chapter 327 added language that its title explains was "[for] the purpose of specifying which conditions constitute valid circumstances for determining the length of an individual[']s disqualification for unemployment insurance benefits; *requiring certain evidence in certain cases; and providing to whom this Act applies."* These changes can be viewed by looking at (1957, 1985 Repl.Vol., 1990 Cum.Supp.) Article 95A, section 6, which provided in relevant part:

An individual shall be disqualified for benefits:

(a) *Voluntarily leaving work.*—If the Executive Director finds that the individual's unemployment is due to his leaving work voluntarily without good cause. Only a cause which is directly attributable to, arising from, or connected with the conditions of employment or actions of the employer may be considered good cause. The individual's disqualification shall be effective for the week in which the unemployment began and shall continue (1) for not less than 4 nor more than 9 weeks immediately thereafter, according to the seriousness of valid circumstances as determined in each case by the Executive Director or (2) until the individual has become reemployed and has earnings in insured work equal to at least ten times his weekly benefit amount. Leaving work to become self-employed, to accompany or join one's spouse in a new locality, or to attend an educational institution is neither good cause nor a valid circumstance for voluntarily leaving work. Only a substantial cause which is directly attributable to, arising from, or connected with the conditions of employment or actions of the employer, or another cause of such a necessitous or compelling nature that the individual had no reasonable alternative other than to leave the employment may be considered a valid circumstance. . . .

(a–1) *Determination of voluntarily quitting employment for good cause.*—An individual will be determined to have voluntarily quit employment for good cause if the individual:

(1) Has been laid off from employment through no fault of the individual;

(2) Obtains subsequent employment that pays weekly wages totalling less than 50% of the weekly wage earned in the employment from which the individual was laid off; and

(3) Leaves the subsequent employment to attend a training program for which the individual has been selected that is:

(i) Offered under the Maryland Job Training Partnership Act; or

(ii) Otherwise approved by the Secretary.

1987 Maryland Laws, chapter 261 originated as House Bill 1170 of 1987. Included in the House Bill 1170's bill file was a fact sheet prepared by Ms. Debra Brown Felser, Assistant Director of AFL–CIO Community Services. This fact sheet lists several arguments, which supported changing the law to allow flexibility in Article 95A, section 6 for training programs. One such argument contended that such flexibility was consistent with the precedent that "[c]laimants are not penalized [unemployment insurance] benefits for a voluntary quit when it was to take a better job from which they were subsequently laid off."

The wording of Article 95A, section 6(a), combined with the evidence presented in the bill files relating to the 1979 legislation and even the 1987 amendments, clearly demonstrate to me that the Legislature intended circumstances where an individual has a reasonable expectation of bettering his or her career or increasing his or her remuneration by quitting to take another employment, and there is a reasonable basis for that individual to believe that he or she has actually obtained the alternative employment and that employment will be of substantial duration, to fall under the scope of voluntarily leaving employment for good cause. This is especially so when he or she, as in the case *sub judice*, has given the prior employer the opportunity to change its compensation standards of employment.

I reiterate that when the General Assembly, in 1979, attempted to reword the statute to limit good cause to a cause attributable to the employer, Mr. Heintz disagreed and presented an alternate amendment, which expanded the scope of good cause to include facts such as those in the case at bar. The General Assembly was acting under the knowledge that the Employment Security Administration, in certain instances, considered quitting a job to take another job at a substantially higher salary, voluntarily leaving with good cause and amended the statute to conform to the agency's interpretation of the then existing statute. The Legislature recognized, as we often do, the interpretation of a statute by an agency charged with administering the statute. We said in *Lussier v. Maryland*

*Racing Commission,* 343 Md. 681, 696–97, 684 A.2d 804, 811–12 (1996):

> The General Assembly has not, over the past 75 years, changed that administrative construction of the statute. *See, e.g., Md. Classified Employees Asso., Inc. v. Governor,* 325 Md. 19, 33, 599 A.2d 91, 98 (1991) ("legislative acquiescence in a long-standing administrative construction ' "gives rise to a strong presumption that the interpretation is correct" ' "); *Morris v. Prince George's County,* 319 Md. 597, 613, 573 A.2d 1346, 1354 (1990) ("long-standing administrative construction of [the statute] and its predecessor statutes by an agency charged with administering them … is entitled to deference"); *Board v. Harker,* 316 Md. 683, 699, 561 A.2d 219, 227 (1989) ("the agency rule is entitled to considerable weight in determining the meaning of [the statute's] provisions"); *McCullough v. Wittner, supra,* 314 Md. [602,] 612, 552 A.2d [881,] 886 [(1989)] ("The interpretation of a statute by those officials charged with administering the statute is, of course, entitled to weight"); *Sinai Hosp. v. Dep't of Employment,* 309 Md. 28, 46, 522 A.2d 382, 391 (1987) ("the long-standing legislative acquiescence [in the administrative interpretation of the statute] gives rise to a strong presumption that the interpretation is correct"); *Balto. Gas & Elec. v. Public Serv. Comm'n,* 305 Md. 145, 161, 501 A.2d 1307, 1315 (1986) ("the contemporaneous interpretation of a statute by the agency charged with its administration is entitled to great deference, especially when the interpretation has been applied consistently and for a long period of time"); *Consumer Protection v. Consumer Pub., supra,* 304 Md. [731,] 759, 501 A.2d [48,] 63 [(1985)] ("The consistent construction of a statute by the agency responsible for administering it is entitled to considerable weight"). [Footnote omitted.]

In the instant case, the Legislature adopted the specific deference standard in respect to agency interpretation urged by the agency; a practice we have long held appropriate. Nonetheless, the majority neither affords any deference to the agency's interpretation, the Legislature's express acceptance

of the agency's interpretation, nor the plain forward legislative history of the statute. It is clear that the General Assembly initially intended, and still intends, for facts such as those presented in the case *sub judice* to be considered leaving with good cause.

Article 95A was recodified as Title 8 of the Labor and Employment Article by 1991 Maryland Laws, chapter 8.[8] That recodification effected no substantive change in the statute or policy. It merely broke up the paragraph that was section 6, paragraph (a) into the outline format in current 8–1001. Although the appearance of section 8–1001 differed from Article 95A, section 6, the substance of the statute remained the same. The Special Revisor's Note to section 8–1001 explains that "this section was new language derived without substantive change from former Art[icle] 95A, [section] 6(a) and (a–1)." The Bill File also includes a report on House Bill 1 of 1991, which states that "[t]he basic thrust of the revision is formal; the primary purposes of the work are modernization and clarification, not policymaking."

This Court has previously addressed the general rules of construction to be applied by the courts when analyzing a general bulk revision of this nature. We said:

> It is true that a codification of previously enacted legislation, eliminating repealed laws and systematically arranging the laws by subject matter, becomes an official Code when adopted by the Legislature, and, since it constitutes the latest expression of the legislative will, it controls over all previous expressions on the subject, if the Legislature so provides. However, the principle function of a Code is to reorganize the statutes and state them in simpler form. Consequently any changes made in them by a Code are presumed to be for the purpose of clarity rather than change of meaning. Therefore, even a change in the phraseology of a statute by a codification thereof will not ordinarily modify the law, unless the change is so radical

---

8. 1991 Maryland Laws, chapter 8 was originally House Bill 1 of 1991.

and material that the intention of the Legislature to modify the law appears unmistakably from the language of the Code.

*Welch v. Humphrey,* 200 Md. 410, 417, 90 A.2d 686, 689 (1952) (citing *Welsh v. Kuntz,* 196 Md. 86, 97, 75 A.2d 343, 347 (1950)); *see also Bureau of Mines v. George's Creek Coal & Land Co.,* 272 Md. 143, 154–55, 321 A.2d 748, 754–55 (1974); *Baltimore Tank Lines v. Public Service Comm'n,* 215 Md. 125, 127–28, 137 A.2d 187, 189 (1957). Therefore, any changes that were made during the recodification from Article 95A to Title 8 were not intended to alter the original intent of the Legislature.

Additional insight as to what the Legislature intended concerning unemployment insurance can be gathered by an analysis of the evolution of section 8–1001 since the 1991 recodification. 1995 Maryland Laws, chapter 578 created section 8–1001, paragraph (a)(2). House Bill 975 of 1995, which became 1995 Maryland Laws, chapter 578, outlined its purpose in its title:

> FOR the purpose of providing that ~~a disqualification from receiving benefits as a result of voluntarily leaving work with a part-time or temporary employer may not disqualify an individual from receiving benefits that the individual otherwise is eligible to receive with respect to employment with the individual's full-time or primary employer~~ certain claimants who voluntarily quit part-time employment and subsequently become unemployed from full-time employment are not disqualified for certain benefits relating to the full-time employment; and generally relating to the effects of voluntarily quitting part-time employment under the Maryland Unemployment Insurance Law.

The enactment of this provision demonstrates the General Assembly's continued policy of not punishing a worker who is attempting to make a better life for himself or herself. Senate Bill 943 of 1979 was drafted, at least in part, with the intent to protect a person who quit a job to take other

employment with the reasonable expectation of bettering his or her career, who then loses that job through no fault of their own. House Bill 1170 of 1987 was designed to protect an individual who was laid off, who subsequently obtained certain employment, and who left that subsequent employment to attend training programs in an effort to obtain a better life and career. Similarly, House Bill 975 of 1995 was designed to protect individuals who have attempted to supplement their full-time work by taking on part-time work, only to quit the part-time work, then get fired from the full-time work. The General Assembly, in my view, has declared a policy, under circumstances such as are presented here, of protecting those individuals who make attempts to improve their careers.

### The General Statutory Scheme

The policy established by the Legislature is further supported by an analysis of the legislative history cf Title 8 of the Labor and Employment Article in its entirety. Title 8 was derived from Maryland Code (1957, 1985 Repl.Vol., 1990 Cum. Supp.), Article 95A. As we said:

> The Unemployment Compensation Law of Maryland, intended to supplement the Federal Social Security Act, 42 U.S.C.A., Secs. 301–1307, was enacted by the Legislature in 1936 in view of the widespread unemployment caused by the depression. The tax demanded from the employer is an excise tax imposed by the Legislature in the exercise of the police power of the State. The Legislature, in announcing the public policy of the State, declared that protection against unemployment is necessary for the achievement of social security, and that the public good and the general welfare of the citizens of the State required enactment of the measure compelling the setting aside of unemployment reserves *to be used for the benefit of persons unemployed through no fault of their own,* thereby limiting the serious social consequences of poor relief assistance.

*Maryland Unemployment Compensation Board v. Albrecht,* 183 Md. 87, 89, 36 A.2d 666, 667 (1944) (emphasis added)

(citation omitted). Similarly, we stated in *Saunders,* 188 Md. at 681–82, 53 A.2d at 580–81:

> Unemployment compensation laws were passed in many, if not all, of the States of the Union following the depression of the early 30's. They were intended to supplement the Federal Social Security Act, 42 U.S.C.A. Sec. 301 *et seq.,* and to provide a cushion against unemployment. There is a certain, if not complete, practical uniformity in these statutes and they are modeled after the English statutes. The Maryland Act contains a declaration of public policy which indicates that the Act is a remedial statute to prevent economic insecurity and involuntary unemployment. We have so held. We have also held, as to this statute, that if its language is plain and free of ambiguity and has a definite and sensible meaning, that meaning will be conclusively presumed to be the intent of the Legislature in enacting the statute.

> The purpose of the statute was to alleviate the consequences of involuntary unemployment. [Citations omitted.]

The legislative findings and policy of Title 8 is outlined in section 8–102, which provides:

(a) *Interpretation and application.*—This section is a guide to the interpretation and application of this title.

(b) *Findings.*—The General Assembly finds that:

(1) economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of the State;

(2) involuntary unemployment is a subject of general interest and concern that requires appropriate action by the General Assembly to prevent the spread of involuntary unemployment and to lighten its burden, which often falls with crushing force on the unemployed worker and the family of the unemployed worker;

(3) the achievement of security for society requires protection against involuntary unemployment, which is the greatest hazard of our economic lives; and

(4) security for society can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, maintaining the purchasing power, and limiting the serious social consequences of poor relief assistance.

(c) *Statement of policy.*—The General Assembly declares that, in its considered judgment, the public good and the general welfare of the citizens of the State require the enactment of this title, under the police powers of the State, for the compulsory setting aside of unemployment reserves to be used for the benefit of individuals unemployed through no fault of their own.

Section 8–102 was derived from Maryland Code (1957, 1985 Repl.Vol., 1990 Cum.Supp.), Article 95A, section 2. Any changes made in the recodification were not intended to be substantive. In fact, with the exception of stylistic changes, the verbiage remains almost identical to Article 95A's original form as then enacted by the General Assembly in 1936.

As I have stated, *supra,* unemployment insurance laws were passed in many, if not all, of the states of the Union following the depression. These laws were intended to supplement the federal Social Security Act and to provide a cushion against unemployment. In keeping with the rationale that unemployment laws were designed to alleviate the burden of involuntary unemployment, it stands to reason that the General Assembly did not want to utilize these laws to punish individuals who quit a job in an attempt to ultimately better their career by taking a better job. This rationale is consistent with the initial intent of Maryland's unemployment insurance laws.

I now turn to Maryland case law and I believe that it is in accord with my interpretation of section 8–1001. *Paynter,* 303 Md. at 37, 491 A.2d at 1193, where we attempted to define "good cause":

To voluntarily leave employment for good cause, the cause must be one which would reasonably impel the aver-

age able-bodied qualified worker to give up his or her employment.

. . . .

The applicable standards are the standards of reasonableness as applied to the average man or woman, and not to the supersensitive. [*Uniweld Products, Inc. v. Industrial Rel. Comm'n, Etc.*, 277 So.2d 827,] 829 [ (Fla.App.1973) ] (Citations omitted).

*See also Management Personnel Serv. v. Sandefur*, 300 Md. 332, 342, 478 A.2d 310, 315 (1984) ("We agree with 14 C.J.S. *Cause* at 44 (1939), ' "just cause" implies the existence of facts justifying the action taken, something more than mere wish.' "); *Black's Law Dictionary* 692–93 (6th ed. 1990) (" 'Good cause' for leaving employment, so as not to render one ineligible for unemployment compensation benefits, must be objectively related to the employment and be such cause as would compel a reasonably prudent person to quit under similar circumstances.") This sets an *objective* rather than subjective standard for determining good cause. *See Paynter*, 303 Md. at 36–37, 491 A.2d at 1193–94. Clearly, it can be reasonable to suggest that an average able-bodied worker might give up one position in order to receive a substantially higher income in a new position. Moreover, he should be encouraged to do so. Applying this objective standard to a person in appellee's situation, it becomes evident to me that, under the circumstances here present, voluntarily leaving employment for a similar job that pays considerably more amounts to leaving for just cause.[9]

---

**9.** In *Maryland Employment Security Board v. Poorbaugh*, 195 Md. 197, 200, 72 A.2d 753, 754 (1950), we held that not reporting for work for 4 months because of poor weather was voluntarily quitting without good cause. In *Paynter*, 303 Md. at 40–41, 491 A.2d at 1195, Paynter, a school teacher, voluntarily left his teaching position because students harassed and disrupted his class to a point that was beyond the control of school authorities. We affirmed the decision of the Circuit Court for Montgomery County, saying that "[a] reasoning mind could have reasonably reached the conclusion that Paynter had good cause to leave his employment." There are a number Court of Appeals and Court of Special Appeals cases which deal solely with defining "voluntarily

As stated, *infra,* there is a certain, if not complete, practical uniformity in the unemployment insurance statutes amongst the fifty states because they are modeled after the English statutes. Several of our sister states, although some have more specific statutory language, are in accord with the view I here express.[10] *Harding v. Industrial Comm'n,* 183 Colo. 52, 57, 515 P.2d 95, 97 (1973) ("[A] worker who voluntarily separates from a job to accept a better job, as defined by statute, shall be eligible for a full award of benefits in the event of subsequent unemployment...."); *Kortz v. Industrial Comm'n,* 38 Colo.App. 411, 413, 557 P.2d 842, 843 (1976) (holding that an individual separated from a job for the purpose of accepting a better job was entitled to full unemployment benefits); *Pugh v. Regal Development Corp.,* 662 So.2d 1355, 1356 (Fla.App. 1 Dist.1995) (holding that a claimant who left a temporary position for another job that paid more and was more permanent left with good cause); *Schafer v. Ada Co. Assessor,* 111 Idaho 870, 872, 728 P.2d 394, 396 (1986) (holding that a claimant who leaves a job with a firm offer of employment from another employer has left with good cause); *Pazzaglia v. Review Board of Indiana Dep't of Employment and Training Servs.,* 608 N.E.2d 1375, 1376 (Ind.Ct. App.1993) (discussing Indiana Code 22–4–15–1, which mandates that an individual not be disqualified for unemployment benefits for quitting one job to take a better job, so long as they work at the new job for at least 10 weeks); *Loeb v. Employment Appeal Board,* 530 N.W.2d 450, 451–52 n. 1 (Iowa 1995) (discussing Iowa Code, section 96.5(1)(a), which

---

leaving work." *Allen v. Core Target City Youth Program,* 275 Md. 69, 338 A.2d 237 (1975); *Department of Economic & Employment Development v. Taylor,* 108 Md.App. 250, 671 A.2d 523 (1996), *aff'd sub nom. Department of Labor, Licensing & Regulation v. Taylor,* 344 Md. 687, 690 A.2d 508 (1997); *Berdych v. Department of Employment & Training,* 69 Md.App. 484, 518 A.2d 462 (1986).

**10.** There are, to be sure, jurisdictions which disagree with my view. *See Pereira v. Administrator, Unemployment Compensation Act,* 6 Conn. App. 658, 506 A.2d 1087 (1986); *Cruz v. District of Columbia Dep't of Employment Servs.,* 633 A.2d 66 (D.C.App.1993); *Grider v. Administrator, Dep't of Employment Security,* 564 So.2d 751 (La.App. 2 Cir.1990).

mandates that where an individual leaves a job "in good faith for the sole purpose of accepting better employment, which the individual did accept and such employment is terminated by the employer ... the individual ... shall be eligible for [unemployment] benefits...."); *Hackenmiller v. Ye Olde Butcher Shoppe*, 415 N.W.2d 432, 434 (1987) (Minn.Stat. Section 268.09, subd. 1(2)(a)(1984) "provides an exception to the voluntary quit disqualification where an individual discontinued employment 'to accept work offering substantially better conditions of work or substantially higher wages or both.'"); *Rider College v. Board of Review, Dep't of Labor & Indus.*, 167 N.J.Super. 42, 48, 400 A.2d 505, 508, (1979) (holding that leaving a job to accept a "substantially more favorable position" was leaving with good cause and not a disqualification for unemployment compensation benefits); *Young v. Tortilla Flats*, 37 Ohio App.3d 41, 41–42, 523 N.E.2d 519, 520 (1987) (holding that pursuant to Ohio Rev.Code Ann., section 4141.29, an individual who resigns from one job to accept a better-paying position constituted a quit with just cause); *Mascorro v. Employment Division*, 70 Or.App. 531, 535, 689 P.2d 1326, 1328 (1984) (holding that leaving work for an offer of a better job was a potentially valid reason for leaving a job); *Top Oil Co. v. Commonwealth Unemployment Compensation Board of Review*, 88 Pa.Cmwlth. 336, 340, 488 A.2d 1209, 1211 (1985) (holding that a claimant who leaves his job for any firm offer of employment, without regard to whether it is better employment, has left for good cause); *Fisher v. Employment Security Dep't of the State of Washington*, 63 Wash.App. 770, 774, 822 P.2d 791, 793 (1992) (Wash.Rev.Code.50.20.050(2)(a) "qualifies leaving 'work voluntarily without good cause' by excluding a situation where one voluntarily leaves employment to pursue other bona fide work.").

### Conclusion

Based on the wording of 8–1001, the only statute relevant in the case at bar, its supporting legislative history, and the general statutory scheme of Title 8, I would hold that where a claimant has a reasonable expectation of bettering his or her

career or increasing his remuneration by quitting one employment to take another employment, and there is a reasonable basis for the claimant to believe that he or she has actually obtained the alternative better employment and that employment will be of substantial duration, the employee has left for good cause. Moreover, it seems manifestly unjust, and contrary to appropriate public policy concerns, to require an employee to immediately abandon the unemployment insurance benefits he has earned and acquired by virtue of his past positive performance, if he attempts to better himself by moving to a better job. Additionally, as I perceive it, the workforce of this State should be encouraged to better themselves, not penalized when they attempt to do so. The majority today places an anchor around the necks of those workers who seek advancement by moving on to better and higher paying jobs.

It is also, at least as I see it, advantageous to the State, to permit workers to seek higher paying jobs, without the penalty of lost benefits in the event they are terminated at the new job. Increased tax revenues, decreased social welfare costs, improvements in social stability and much more, can be important results of encouraging workers to better themselves.

The majority strains to avoid examining the legislative history of the relevant statute by continuing to assert that the statute, in its view the statutes, are unambiguous. Even a momentary peak at the relevant legislative history would necessitate a holding contrary to that of the majority. In order to avoid the only conclusion indicated by the legislative history, the majority has adopted a concept from the nursery rhymes of my childhood. "See no evil, hear no evil, speak no evil." In other words, the majority has it "blinders" [11] on.

In the present case, (1) appellee was offered a similar job that included a substantial increase in base salary; (2) appellee informed appellant of the offer and gave appellant an

---

11. In equine terms, "prevents a horse from seeing something on either side."

opportunity to match it; (3) appellant declined to match the offer; (4) appellee began working at the new employment with reasonable belief that the employment would be of substantial duration; and (5) appellee was terminated from the new employment, apparently with no cause attributable to him. Nonetheless, the majority penalizes the employee, who, like the employer, has done no wrong, by denying him benefits accrued through his employment. Moreover, the majority's decision may well require, and certainly permits, the Department of Labor, Licensing and Regulation to seek to recover benefits that may have been paid to numerous workers in the last year. Section 8–809, **Recovery of benefits**, provides in relevant part:

(a) ... The Secretary may recover benefits paid to a claimant if the Secretary finds that the claimant was not entitled to the benefits because:

. . . .

(3) due to a redetermination of an original claim by the Secretary, the claimant is disqualified or otherwise ineligible for benefits.

I would hold that appellee had good cause to voluntarily leave his initial employer and as such is entitled to unemployment insurance benefits. Accordingly, I would affirm.

Judges ELDRIDGE and RAKER have authorized me to state that they concur with the views expressed herein.